**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF FLORIDA**
**GAINESVILLE DIVISION**
**www.flnb.uscourts.gov**

In re:                                                    CASE NO.: 24-10056-KKS
                                                          CASE NO.: 24-10057-KKS
**CELEBRATION POINTE HOLDINGS, LLC**          CASE NO.: 24-10058-KKS
**CELEBRATION POINTE HOLDINGS II, LLC**
**SHD-CELEBRATION POINTE, LLC**               CHAPTER 11

         **Debtors.**                             *Joint Administration under*
                                                  *Case No. 24-10056-KKS*

_____/


**DISCLOSURE STATEMENT PURSUANT TO 11 U.S.C. § 1125**
**FOR CELEBRATION POINTE HOLDINGS, LLC, et al.**




COUNSEL FOR THE DEBTOR

R. SCOTT SHUKER, ESQ.
LAUREN L. STRICKER, ESQ.
SHUKER & DORRIS, P.A.
121 S. ORANGE AVENUE, SUITE 1120
ORLANDO, FLORIDA 32801



June 28, 2024

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF FLORIDA**
**GAINESVILLE DIVISION**
**www.flnb.uscourts.gov**

| | |
|---|---|
| **In re:** | **CASE NO.: 24-10056-KKS** |
| | **CASE NO.: 24-10057-KKS** |
| **CELEBRATION POINTE HOLDINGS, LLC** | **CASE NO.: 24-10058-KKS** |
| **CELEBRATION POINTE HOLDINGS II, LLC** | |
| **SHD-CELEBRATION POINTE, LLC** | **CHAPTER 11** |
| **Debtors.** | *Joint Administration under* |
| | *Case No. 24-10056-KKS* |

_____/

**DISCLOSURE STATEMENT PURSUANT TO 11 U.S.C. § 1125**
**FOR CELEBRATION POINTE HOLDINGS, LLC et al.**

I.    **ARTICLE I - INTRODUCTION**

    A.    **Disclosure Statement Introduction**

This Disclosure Statement ("Disclosure Statement") is filed pursuant to the requirements of section 1125 of Title 11 of the United States Code (the "Bankruptcy Code"). This Disclosure Statement is intended to provide adequate information to enable Holders[1] of Claims in the above-captioned bankruptcy cases (the "Bankruptcy Cases") to make an informed judgment about the Plan of Reorganization (hereinafter the "Plan")[2] submitted by Celebration Pointe Holdings, LLC ("CPH"), Celebration Pointe Holdings II, LLC ("CPH2"), and SHD-Celebration Pointe, LLC ("SHD") (hereinafter referred to collectively as the "Debtors" or "Reorganized Debtors"– where appropriate). The Debtors are soliciting votes to accept the Plan, the overall purpose of which is

---

[1] All capitalized terms shall have the meaning ascribed in Article II of the Plan or as defined herein.

[2] In the event of any inconsistency between this Disclosure Statement and the Plan, the Plan Controls.

to provide for the restructuring of the Debtors' liabilities in a manner designed to maximize

recoveries to all stakeholders while providing for the Debtors to continue as a going concern.

**THIS DISCLOSURE STATEMENT AND ITS RELATED DOCUMENTS ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT THE PLAN. THIS INTRODUCTION AND SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE REMAINING PORTIONS OF THIS DISCLOSURE STATEMENT, AND THIS DISCLOSURE STATEMENT IN TURN IS QUALIFIED, IN ITS ENTIRETY, BY THE PLAN. THE PLAN IS AN INTEGRAL PART OF THIS DISCLOSURE STATEMENT, AND ANY HOLDER OF ANY CLAIM OR INTEREST SHOULD READ AND CONSIDER THE PLAN CAREFULLY IN LIGHT OF THIS DISCLOSURE STATEMENT IN MAKING AN INFORMED JUDGMENT ABOUT THE PLAN. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN, THE PLAN CONTROLS. ALL CAPITALIZED TERMS USED IN THIS DISCLOSURE STATEMENT SHALL HAVE THE DEFINITIONS ASCRIBED TO THEM IN THE PLAN UNLESS OTHERWISE DEFINED HEREIN.**

**NO REPRESENTATION CONCERNING THE DEBTORS IS AUTHORIZED OTHER THAN AS SET FORTH HEREIN. ANY REPRESENTATIONS OR INDUCEMENTS MADE THAT ARE OTHER THAN AS CONTAINED HEREIN SHOULD NOT BE RELIED UPON IN ARRIVING AT A DECISION ABOUT THE PLAN.**

**THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO AUDIT. FOR THAT REASON, AND DUE TO THE COMPLEXITY OF THE DEBTORS' FINANCIAL AFFAIRS, AND THE IMPOSSIBILITY OF MAKING ASSUMPTIONS, ESTIMATES, AND PROJECTIONS WITH COMPLETE ACCURACY, THE DEBTORS ARE UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT INACCURACY, ALTHOUGH EVERY REASONABLE EFFORT HAS BEEN MADE TO ENSURE THAT SUCH INFORMATION IS ACCURATE.**

**THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION, NOR HAS THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN. AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, CAUSES OF**

**ACTION, AND OTHER ACTIONS, THE DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.**

**B.    Overview of Plan.**

All Claims held against the Debtors shall be classified and treated pursuant to the terms of the Plan. The Plan contains thirty one (31) separate classes of Claims and Interests. The Effective Date is defined more specifically in the Plan, but generally means the fifteenth (15th) day after entry of the Confirmation Order, provided said order is not stayed as of the fifteenth (15th) day.

All Claims held against the Debtors shall be classified and treated pursuant to the terms of the Plan. The Plan contains thirty one (31) separate classes of Claims and Interests. The Plan provides for payment of Allowed Secured Claims in Classes 1 through 28, with the exception of Class 17, in full, over time and under the terms as outlined in Article V below. The Allowed Class 17 Claim shall receive a discounted payment on the Effective Date in full satisfaction of its Allowed Claim. The Allowed Unsecured Claims of Insiders in Class 30 shall not receive periodic payments, but the Allowed Claims will accrue interest at the Prime Rate and maturity in 10 years from the Effective Date. Allowed General Unsecured Claims[3] in Class 29 shall be paid overtime from a *pro rata* distribution of the *Cash Flow* Note over a period of 60 months. In addition, the Plan further provides that the respective Holders of Allowed Administrative Claims and Holders of Allowed Priority Claims will be paid in full on the Effective Date. Holders of Allowed Priority

---

[3] "Allowed General Unsecured Claim" is defined in the Plan, but for clarity here, it means an Allowed General Unsecured Claim (as defined in the Plan) but which excludes Claims of Insiders and Affiliates (defined below and in the Plan).

Tax Claims will be paid in full by quarterly payments made over five (5) years. The Allowed Interests in Class 31 will carry forth after the Effective Date.

The Plan is premised on a Plan Support Agreement ("PSA") between the primary interest holders of Debtors, Mr. Svein Dyrkolbotn ("Dyrkolbotn") and Ms. Patti Shively ("Shively"). Under the PSA, Dyrkolbotn and Shively are agreeing to defer payment on Claims, and, most importantly, make member loans or contributions to cover operating deficits such that Reorganized Debtors can make all payments required on the Effective Date and Plan Payments due over time as set forth below (the "PSA Contributions"). Although Debtors and the SPEs generate cash for operations and debt service, there is insufficient cash flow to meet the payments required under the Plan and the PSA Contributions are integral to the success of the Plan and the Reorganized Debtors. Without the PSA Contributions, the Debtors would be forced to liquidate. In return for the PSA Contributions the Plan provides for Conditional Injunctions protecting the parties to the PSA and each SPE so long as respective Plan Payments are current. Debtors believe the Plan provides the best means currently available for their emergence from chapter 11 and the best recoveries possible for Holders of Claims and Interests, and thus strongly recommend Creditors vote to accept the Plan.

### C. Voting and Impairment of Claims and Interests.

To the extent the legal, contractual, or equitable rights with respect to any Claim asserted against the Debtors are altered, modified, or changed by treatment proposed under the Plan, such Claim is considered "Impaired," and the Holder of such Claim or Interest is entitled to vote in favor of or against the Plan. A Ballot for voting in favor of or against the Plan ("Ballot") will be mailed along with the order approving this Disclosure Statement. You should use the Ballot that will be sent to you to cast your vote for or against the Plan. You may *not* cast Ballots or vote

orally or by facsimile. Whether or not you vote, you will be bound by the terms and treatment set forth in the Plan if the Bankruptcy Court confirms the Plan. The Bankruptcy Court may disallow any vote accepting or rejecting the Plan if the vote is not cast in good faith.

**THE VOTE OF EACH CREDITOR WITH AN IMPAIRED CLAIM IS IMPORTANT. TO BE COUNTED, YOUR BALLOT MUST BE <u>RECEIVED</u> AT THE ADDRESS(ES) AND BY THE DATE SET FORTH IN THE BALLOT.**

Upon receipt, the Ballots will be tabulated, and the results of the voting will be presented to the Bankruptcy Court for its consideration. As described in greater detail below, the Bankruptcy Code prescribes certain requirements for confirmation of a plan. The Bankruptcy Court shall schedule a Confirmation Hearing to consider whether the Debtors have complied with those requirements.

The Bankruptcy Code permits a court to confirm a plan even if all Impaired Classes have not voted in favor of a plan. Confirmation of a plan over the objection of a Class is sometimes called "cramdown." As described in greater detail in this Disclosure Statement, the Debtors have expressly reserved the right to seek cramdown in the event all Impaired Classes do not vote in favor of the Plan.

## II.    <u>ARTICLE II – BACKGROUND AND EVENTS LEADING TO BANKRUPTCY</u>

### A.    General Background

The Debtors manage, own, or participate in a large mixed-use development project in Gainesville, Florida, known as Celebration Pointe (the "Project"). As described in more detail below, the Project site is adjacent to Interstate 75 and is accessible via Archer Road and a newly constructed bridge overpass. The Project is comprised of over 2,000,000 SF of retail, restaurant, office, and residential development. CPH is the main developer of the Project and was the original owner of the real estate. Some of the real estate parcels were later transferred or assigned to CPH2.

SHD is the Manager of both CPH and CPH2 and is also manager of most of the affiliated special purpose entities that have been created as sub-projects were developed (individually, a "SPE" and collectively, the "SPEs"). All three of the Debtors are co-obligors on most (if not all) of the debt obligations owed to the largest creditors.

Additionally, the Debtors share common management and, in some instances, common ownership. The Debtors operate subject to certain management and organizational documents (collectively, the "Organizational Documents") by or between themselves, other non-debtor affiliates, or the SPEs which own completed subprojects or income-producing parcels with the Project's long-term tenants. Although SHD is the Manager of both CPH and CPH2, the day-to-day operation of the companies are conducted via a management agreement with non-debtor, Viking Companies, LLC ("Viking"). Viking provides administrative, supervisory, and management services with respect to the operations of the Project as a whole, as well as the Debtors, other non-debtor affiliates, and separate entities which own or operate the income-producing subproject parcels. In return, Viking earns a management fee as set forth in various entity operating agreements.

The Project started with a vision and 225 acres at the northwest quadrant of Interstate 75 and Archer Road (SR 24). Ideally situated in the heart of Alachua County, the Project is designed to meet the retail and entertainment needs of the growing and affluent suburban neighborhoods on the West side of Interstate 75. The Project also targets the growing demand for a walkable, upscale urban housing environment on the 160 developable acres. The Project is the only large-scale development in Alachua County featuring almost a mile of frontage along Interstate 75, providing great visibility for retailers, and class A office tenants. With 700 acres of pristine conservation area along the western boundary of the development, the Project blends an

exciting urban environment with the beautiful natural setting that makes Alachua County and Gainesville such desirable places to live.

Beginning in 2008 with the assemblage of multiple parcels of land, the journey to the groundbreaking lasted until 2013, when the clearing of land began. By the next year, infrastructure, including public and private areas, was well underway. By 2015, the main road into the Project, SW 45th Street from Archer Road, SW 43rd Street and the bridge over I-75 were all under construction in preparation for the Project's first occupants. In November 2016, Bass Pro Shops opened its doors to much anticipation and fanfare. The store continues to be a strong draw from North Florida as well as South Georgia. Development continued with the sale of a parcel of land to InfoTech who would go on to relocate their headquarters from the Florida Farm Bureau building, south of the Project, to its new, state of the art, LEED certified building in the Project. InfoTech occupied this new building in 2017.

The next addition to the Project was the first phase of the Promenade. Anchored by Regal Cinemas and including 67,000 square feet of retail space across from what is now known as Steve Spurrier Way, the Promenade tenants opened their doors beginning in April of 2018. The Promenade includes a mix of restaurants and soft goods users. From Nike to Palmetto Moon to Spurrier's Gridiron Grill and the fine dining steaks and oysters that are the hallmark of Prime & Pearl, the Promenade offers shopping and entertainment for its guests. Adding to the restaurant mix was the relocation of Miller's Ale House to the Project later in 2018. In 2019, a second office building was added, 5001 Celebration Pointe Ave and the first hotel, Hotel Indigo Gainesville-Celebration Pointe, a partnership between CPH and Peachtree Hotel Group. The addition of this Class A office and boutique hotel, designed with the history of Gainesville at the forefront, only enhanced the already burgeoning development. Additionally, The Shops at Celebration Pointe,

two buildings totaling approximately 17,000 square feet of retail, was completed. Offerings included a day spa, national jeweler, International Diamond Center, and a local restaurant operator with a new concept, Hana Sushi. This area expanded to include Dave and Busters (19,000 square feet) and another 4,000 square foot building, which is home to Escapology, an escape room concept. On the residential front, 2019 saw the completion of the first 6 units of The Vue Townhomes. As of the Petition Date, 30 of the 86 townhome units have been built, with 26 sold. The Vue also includes 9 single family detached lots, of which 2 have been built, one sold and one on the market.

In 2021, construction commenced on the 150,000 square foot Alachua County Sports & Events Center, a public-private partnership between affiliates of CPH and Alachua County. At that time, just coming out of the Pandemic, the Events Center was widely anticipated to be a great shot in the arm for the Celebration Pointe development, expected to bring significant and recurring traffic to the Project. The County contributed in excess of $30 million toward the construction of the Center, the State of Florida contributed $2.32 million and affiliates of CPH contributed the remainder of the development costs and entered into various operations and development agreements with Alachua County. The Events Center was completed and opened in 2023, in the teeth of the economic volatility of interest rates and surging inflation that has been ongoing since. City Place Apartments, comprising two buildings and 220 units, was completed in 2021. The reception was exceptional with occupancy growing to 100% within the first 12 months. The second phase of these apartments was started in 2022 and is on schedule to be completed in the fourth quarter of 2024.

### B.    Significant Developments and Events Leading to Bankruptcy Filing

Due to the COVID-induced global economic crisis in March of 2020 and the subsequent economic challenges to businesses worldwide, the Debtors faced unavoidable development and income delays but remained steadfast in progressing developing the Project. The hardships brought on by the pandemic lasted for months. Development stalled and tenant operations were (at best) languishing. The lack of developmental progress, coupled with the negative impacts of its tenants (e.g., no customers, rent abatements, interest rate increase, curtailment requirements, etc.), severely diminished the Project's revenues and cash flows of the Debtors. Despite these hardships, to the best of its ability, the Project continued to move forward. Development continued, subprojects progressed towards completion, and transactional work conducted by moving real estate parcels and interests into separate LLCs for those specific subprojects; however, the delay in obtaining income producing projections put greater stress on funding and lending options.

As regular development activities were able to recommence after the pandemic, the Debtors were hit with a series of interest rate increases under which prime rate almost tripled, which coincided with unprecedented inflation surges. These extraordinarily adverse economic conditions resulted in an even greater strain on the Project's already suffering cash flow problems. Unfortunately, because of the pandemic, interest rate hikes, and inflationary surges, the Project was forced to turn to alternative lending arrangements. Most of these non-traditional loans came with extremely high interest rates and fees. Resulting from the compilation of all these negative conditions, the Debtors gradually fell behind on their loan payments.

While most of the Project's lenders cooperatively worked with the Debtors on reaching forbearance or alternative payment arrangements, some integral lenders refused to negotiate in good faith and even attempted to extract commercially unreasonable terms from the

Debtors. The Debtors have actively pursued avenues for debt restructuring and stakeholder negotiations; however, despite these efforts to restructure debts and negotiate with lenders, certain lenders were unwilling to restructure and indicated a desire to liquidate the Project. For the protection of all creditors and interest holders, the Debtors determined that it was in the best interests of all parties to reorganize through chapter 11.

### C.   Significant Developments and Events Subsequent to Debtor's Chapter 11 Filing

On March 14, 2024 (the "Petition Date"), the Debtors filed their petition for relief under chapter 11 of the Bankruptcy Code. No trustee has been appointed. The Debtors continue to operate their business and manage their properties as debtors-in-possession under sections 1107 and 1108 of the Bankruptcy Code. Following the Petition Date, the Debtors have continued to operate as debtors-in-possession under Section 1107(a) and 1108 of the Bankruptcy Code. At the commencement of the case, Debtors have also sought and obtained:

1.    Authority to jointly administer these Bankruptcy Cases (CPH ECF No. 17, CPH2 ECF No.17, and SHD ECF No. 17).

2.    Authority to maintain its prepetition bank accounts on a temporary basis (CPH ECF No. 114).

3.    On May 9, 2024, the U.S. Trustee filed a notice of not appointing a committee of unsecured creditors in these Bankruptcy Cases (CPH ECF NO. 73, CPH2 ECF No. 29, and SHD ECF No. 27).

The post-petition negotiations with creditors and the terms of the Plan are expected to provide solid footing for the Reorganized Debtor going forward.

## III.   <u>ARTICLE III - THE PLAN</u>

**THE FOLLOWING SUMMARY IS INTENDED ONLY TO PROVIDE AN OVERVIEW OF THE DEBTORS' PLAN. ANY PARTY IN INTEREST**

**CONSIDERING A VOTE ON THE PLAN SHOULD CAREFULLY READ THE PLAN IN ITS ENTIRETY BEFORE MAKING A DETERMINATION TO VOTE IN FAVOR OF OR AGAINST THE PLAN. THIS SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE PLAN.**

### A.    Summary of Classes in the Plan

| Class | Claims and Interests | Status | Voting Rights |
|-------|----------------------|--------|---------------|
| 1 | Secured Claim of U.S. Bank Trust Company, N.A. (CPH). | Impaired | Entitled to vote |
| 2 | Secured Claim of U.S. Bank Trust Company, N.A. (CPH2). | Impaired | Entitled to vote |
| 3 | Secured Claim of Mainstreet Community Bank (Loan # 4350782) | Impaired | Entitled to vote |
| 4 | Secured Claim of Mainstreet Community Bank (Loan # 4385527) | Impaired | Entitled to vote |
| 5 | Secured Claim of Mainstreet Community Bank (Loan # 4376560) | Impaired | Entitled to vote |
| 6 | Secured Claim of Vystar Credit Union (CPH Claim No. 22) | Impaired | Entitled to vote |
| 7 | Secured Claim of Vystar Credit Union (CPH Claim No. 6 and CPH2 Claim No. 5) | Impaired | Entitled to vote |
| 8 | Secured Claim of Vystar Credit Union (CPH Claim No. 7) | Impaired | Entitled to vote |
| 9 | Secured Claim of Vystar Credit Union (CPH Claim No. 8 and SHD Claim No.3) | Impaired | Entitled to vote |
| 10 | Secured Claim of Vystar Credit Union (CPH2 Claim No. 6) | Impaired | Entitled to vote |
| 11 | Secured Claim of Synartis Income Fund, LLC & Catalyst Synartis CP Master 4A-2023, LLC (CPH Claim No. 33 and CPH2 Claim 12) | Impaired | Entitled to vote |
| 12 | Secured Claim of Synartis Capital Management LLC (CPH Claim No. 30) | Impaired | Entitled to vote |
| 13 | Secured Claim of Synartis Capital Management LLC (CPH Claim No. 32) | Impaired | Entitled to vote |
| 14 | Secured Claim of Catalyst Income Fund 2022-1A, LLC (CPH Claim No. 26) | Impaired | Entitled to vote |
| 15 | Secured Claim of Catalyst Synartis MF B Series Condo 3A-2023, LLC (CPH Claim No. 27) | Impaired | Entitled to vote |

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| 16 | Secured Claim of Catalyst Synartis MF B Series MF 2A-2022, LLC (CPH Claim No. 28) | Impaired | Entitled to vote |
| 17 | Secured Claim of ARCISCAP-Celebration Pointe Investment (B.V.I.) Limited (CPH Claim 15) | Impaired | Entitled to vote |
| 18 | Secured Claim of Iceberg Real Estate Investments, LLC (CPH Claim 34, CPH2 Claim 13, and SHD Claim 6) | Impaired | Entitled to vote |
| 19 | Secured Claim of James B. Euliano, as Trustee of the Neil R. Euliano Irrevocable Trust JBE dated December 28, 2009, and Neil R. Euliano, as Trustee of the Neil R. Euliano Irrevocable Trust NRE II dated December 28, 2009 | Impaired | Entitled to vote |
| 20 | Secured Claim of Jon Guven and J&R Investments, LLC | Impaired | Entitled to vote |
| 21 | Secured Claim of Kenneth R. McGurn & Linda C. McGurn | Impaired | Entitled to vote |
| 22 | Secured Claim of Gainesville PropCo LLC (CPH2 Claim 8) | Impaired | Entitled to vote |
| 23 | Secured Claim of Gainesville PropCo LLC (CPH Claim 25 and CPH2 Claim 9) | Impaired | Entitled to vote |
| 24 | Secured Claim of FDOT's State Infrastructure Bank | Impaired | Entitled to vote |
| 25 | Secured Claim of Florida Credit Union | Impaired | Entitled to vote |
| 26 | Secured Claim of Barwick Banking Company | Impaired | Entitled to vote |
| 27 | Secured Claim of Johnson Controls Security Solution | Impaired | Entitled to vote |
| 28 | Secured Claim of State Board of Administration of Florida | Impaired | Entitled to vote |
| 29 | General Unsecured Claims | Impaired | Entitled to vote |
| 30 | Insider and Affiliate Unsecured Claims | Impaired | Entitled to vote |
| 31 | Equity Interests | Unimpaired | Not entitled to vote |

### B.    Impairment of Claims

To the extent the legal, contractual, or equitable rights with respect to any Claim or Interest asserted against the Debtors is altered, modified, or changed by treatment proposed under the Plan, such Claim or Interest is considered "Impaired," and the Holder of such Claim or Interest is entitled to vote in favor of or against the Plan. The characterization of each Claim or Interest as "Impaired" or "Unimpaired" is set forth below.

### C.    Determination of Allowed Amounts

Treatment prescribed for Claims in the following sections shall in all events refer exclusively to the Allowed Amounts of each respective Claim. In the event the Allowed Amount of any Claim is not determined by agreement or otherwise prior to the Effective Date, then the treatment prescribed shall be deemed effective as of the date of the determination of such Claim by agreement, Final Order or as otherwise provided under the Plan. Notwithstanding Confirmation of the Plan, Debtor reserves the right to seek to value (under section 506 of the Bankruptcy Code) or to object to any Claim (other than Claims deemed in the Plan to be Allowed Claims) for any reason authorized by applicable bankruptcy and non-bankruptcy law, as well as the right to assert that any such Claim includes amounts subject to equitable subordination or other equitable relief.

### IV.    ARTICLE IV – ADMINISTRATIVE EXPENSES, PRIORITY CLAIMS, U.S. TRUSTEE FEES AND CLASSIFICATION AND TREATMENT OF UNIMPAIRED CLAIMS

### A.    Administrative Expense Claims

In full and final satisfaction, settlement, release and discharge of each Allowed Administrative Claim, Holders of an Allowed Administrative Expense Claim shall be paid in full on the Effective Date, or upon such other terms as may be agreed upon by the Holder of the Claim and the Debtors, or, if the Claim does not become Allowed prior to the Effective Date, on the date the Allowed Amount of such claim is determined by Final Order of the Bankruptcy Court. The

Allowed Administrative Claims shall be paid from the Debtors' funds available, operational revenue, and the PSA Contributions. Debtor estimates Administrative Claims to be approximately $1,000,000, after deducting pre-petition and post-petition retainers. Pursuant to the Plan Terms, nothing herein restricts the right of any party to object to any Administrative Claims.

### B.    Priority Claims

#### 1.    Allowed Priority (Non-Real Estate) Tax Claims

Except to the extent that the Holder and the Debtors have agreed or may agree to a different treatment, in full satisfaction of each Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive, in full satisfaction of such Claim, payments equal to the Allowed Amount of such Claim. Allowed Priority Tax Claims will be paid based on a five (5) year amortization with final payment due on or before 5 years from the Petition Date. Each Allowed Priority Tax Claim will accrue interest at five percent (5.00%); the payments will be made quarterly. Payments will commence on the later of the Effective Date or on such dates as a respective Priority Claim becomes Allowed. The source of payments for Allowed Priority Tax Claims will be from the operational revenue of the Reorganized Debtors. The current amount of such claims is zero.

#### 2.    Allowed Priority Claims (Non-Tax)

Except to the extent that the Holder and the Debtors have agreed or may agree to different treatment, in full satisfaction of each Priority Claim (non-tax), exclusive of Priority Tax Claims under 11 U.S.C. § 507(a)(8), each Holder of an Allowed Priority Claim shall receive payment of such Claim in full on the Effective Date. Payment will be made on the Effective Date or the date on which such Priority Claim becomes Allowed. The source of payments for

Priority Claims (non-tax) will be from the Debtors' funds available, operational revenue, and the PSA Contributions. The filed amount of such claims is $127,949.36.

### C.    United States Trustee Fees

All fees required to be paid by 28 U.S.C. § 1930(a)(6) (U.S. Trustee Fees) will accrue and be timely paid until the case is closed, dismissed, or converted to another chapter of the Bankruptcy Code. Any U.S. Trustee Fees owed on or before the Effective Date will be paid when due in the ordinary course from cash on hand or the PSA Contributions.

## V.    ARTICLE V – CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

There are thirty (30) Classes of Claims that are Impaired, zero (0) Classes of Claims that are Unimpaired, and one (1) Class of Interests that is Unimpaired. Treatment for these classes is as follows:

### A.    Secured Claims (including guaranty Claims secured directly by SPE assets).

1.    Class 1 – Secured Claim of U.S. Bank Trust Company, N.A. (CPH Claim 24)

Class 1 consists of the Allowed Secured Claim of U.S. Bank Trust Company, N.A. ("U.S. Bank") based on various prepetition loan and bond documents with the forming the basis of several bond series issued by the CDD. The Claim as to Class 1 was filed in the amount of $8,357,742.83. The Class 1 Claim is secured by substantially all the real property owned by Debtors and each SPE.

In full satisfaction of the Allowed Class 1 Claim, the Class 1 Holder shall retain its Lien and be paid as follows:  (i) on the Effective Date, Reorganized Debtors shall replenish the interest reserve account which was used to cover the May 1st payment; (ii) pay the scheduled interest payment due in October 2024; (iii) add any principal currently due and due upon true-up as a balloon payment to the balance due at the end of each bond series maturity date; (iv) update

the assessment methodology to reflect the true-up of the bonds and the abatement agreements with SPEs and CPH, based on current collections and future anticipated development (anticipated annual debt service of $3,829,606); (v) interest rate on the bonds equal to current contract rate; (vi) 100% pledge of future MMTM and TIF reimbursements to be applied to the deferred principal due; (vii) upon the Effective, date deed any of real property owned by Debtors into The District as required under the documents; and (viii) replenish the MMTM/TIF reserve and apply towards shortfall of 2024 payments.

The Allowed Class 1 Claim shall be paid from the Debtors' operational revenue and the PSA Contributions. Class 1 is Impaired.

2.    Class 2 – Secured Claim of U.S. Bank Trust Company, N.A. (CPH2 Claim 7

Class 2 consists of the Allowed Secured Claim of U.S. Bank based on various prepetition loan and bond documents with the forming the basis of several bond series issued by the CDD. The Claim as to Class 2 was filed in the amount of $4,318,914.46. The Class 2 Claim is secured by substantially all the real property owned by Debtors and each SPE.

In full satisfaction of the Allowed Class 2 Claim, the Class 2 Holder shall retain its Lien and be paid as follows: (i) on the Effective Date, Reorganized Debtors shall replenish the interest reserve account which was used to cover the May 1st payment; (ii) pay the scheduled interest payment due in October 2024; (iii) add any principal currently due and due upon true-up as a balloon payment to the balance due at the end of each bond series maturity date; (iv) update the assessment methodology to reflect the true-up of the bonds and the abatement agreements with SPEs and CPH, based on current collections and future anticipated development (anticipated annual debt service of $3,829,606); (v) interest rate on the bonds equal to current contract rate; (vi) 100% pledge of future MMTM and TIF reimbursements to be applied to the deferred principal

due; (vii) upon the Effective, date deed any of real property owned by Debtors into The District as required under the documents; and (viii) replenish the MMTM/TIF reserve and apply towards shortfall of 2024 payments.

The Allowed Class 2 Claim shall be paid from the Debtors' operational revenue and the PSA Contributions. Class 2 is Impaired.

3.    Class 3 – Secured Claim of Mainstreet Community Bank (Loan #4350782/CPH Claim 2 and  CPH2 Claim 3)

Class 3 consists of the Allowed Secured Claim of Mainstreet Community Bank ("Mainstreet") based on various loan documents including a note, mortgage and guaranties all related to the SPE which owns the real property leased to Bass Pro Shops. The Claims as to Class 3 were filed in the amount of $6,278,919.21 and are secured by a mortgage on the SPE which owns the real property leased to Bass Pro Shops.

In full satisfaction of the Class 3 Claim, the Holder shall retain its Liens and be paid according to the prepetition loan documents (at the non-default interest rate); provided, however maturity shall be extended to December 2034. The Allowed Secured Claim shall be paid from the SPE operational revenue and PSA Contributions. Class 3 is Impaired.

4.    Class 4 – Secured Claim of Mainstreet Community Bank (Loan #4385527/CPH Claim 17 and CPH Claim 2)

Class 4 consists of the Allowed Secured Claim of Mainstreet based on various loan documents. The Class 4 Claim as to Class 4 was filed in the amount of $6,904,867.19.

In full satisfaction of the Allowed Class 4 Claim, the Holder shall be paid interest only, at the non-default contract rate, for a period of thirty six (36) months and, thereafter, the Holder shall receive monthly payments of principal and interest based on a thirty (30) year amortization until maturity. The Class 4 Claim shall mature on December 31, 2034. The Allowed

Class 4 Claim shall be paid from the Debtors' funds available and the PSA Contributions. Class 4 is Impaired.

     5.    Class 5 – Secured Claim of Mainstreet Community Bank (Loan #4376560/CPH Claim 19)

Class 5 consists of the Allowed Secured Claim of Mainstreet based on various loan documents including a note and mortgage which is secured by the SPE which owns Spurrier's Gridiron Grille. The Claim related to Class 5 was filed in the amount of $530,090.17

In full satisfaction of the Allowed Class 5 Claim, the Holder shall be paid interest only, at the non-default contract rate, for a period of thirty six (36) months and, thereafter, the Holder shall receive monthly payments of principal and interest based on a thirty (30) year amortization until maturity. The Class 5 Claim shall mature on December 31, 2034. The Allowed Class 5 Claim shall be paid from operational revenue from the SPE and the PSA Contributions. Class 5 is Impaired.

     6.    Class 6 – Secured Claim of Vystar Credit Union (CPH Claim 22)

Class 6 consists of the Allowed Secured Claim of Vystar Credit Union ("Vystar") based on various loan documents including a note and mortgage which is secured by the SPE which owns the property leased to 5001 Office Building. The Claim related to Class 6 was filed in the amount of $14,663,991.90.

In full satisfaction of the Class 6 Claim, the Holder shall retain its Liens and, after a twenty four (24) month period of interest only payments (at the non-default rate), be paid the contractual amount of principal and interest based on the existing amortization. The maturity date and all other loan terms will not be altered. The Allowed Secured Claim shall be paid from operational revenue of the SPE and the SPA Contributions. Class 6 is Impaired.

7.      Class 7 – Secured Claim of Vystar Credit Union (CPH Claim 6 and CPH2 Claim 5)

Class 7 consists of the Allowed Secured Claim of Vystar based on various loan documents including a note and mortgage which is secured by the SPE which owns the property leased to Regal Cinema. The Claim related to Class 7 was filed in the amount of $8,911,077.32.

In full satisfaction of the Class 7 Claim, the Holder shall retain its Liens and, after a twenty four (24) month period of interest only payments (at the non-default rate), be paid the contractual amount of principal and interest based on the existing amortization. The maturity date and all other loan terms will not be altered. The Allowed Secured Claim shall be paid from operational revenue of the SPE and the SPA Contributions. Class 7 is Impaired.

8.      Class 8 – Secured Claim of Vystar Credit Union (CPH Claim 7)

Class 8 consists of the Allowed Secured Claim of Vystar based on various loan documents including a note and mortgage which is secured by the SPE which owns the property known as Millers Ale House. The Claim related to Class 8 was filed in the amount of $3,336,613.78.

In full satisfaction of the Class 8 Claim, the Holder shall retain its Liens and, after a twenty four (24) month period of interest only payments (at the non-default rate), be paid the contractual amount of principal and interest based on the existing amortization. The maturity date and all other loan terms will not be altered. The Allowed Secured Claim shall be paid from operational revenue of the SPE and the SPA Contributions. Class 8 is Impaired.

9.      Class 9 – Secured Claim of Vystar Credit Union (CPH Claim 8 and SHD Claim 3)

Class 9 consists of the Allowed Secured Claim of Vystar based on various loan documents including a note and mortgage which is secured by the SPE which owns known as City Walk Phase 1. The Claim related to Class 9 was filed in the amount of $16,138,837.46.

In full satisfaction of the Class 9 Claim, the Holder shall retain its Liens and, after a twenty four (24) month period of interest only payments (at the non-default rate), be paid the contractual amount of principal and interest based on the existing amortization. The maturity date and all other loan terms will not be altered. The Allowed Secured Claim shall be paid from operational revenue of the SPE and the SPA Contributions. Class 9 is Impaired.

10.    Class 10 – Secured Claim of Vystar Credit Union (CPH2 Claim 6)

Class 10 consists of the Allowed Secured Claim of Vystar based on various loan documents including a note and mortgage which is secured by the SPE which owns known as the Shops at Celebration. The Claim related to Class 10 was filed in the amount of $5,520,563.40.

In full satisfaction of the Class 10 Claim, the Holder shall retain its Liens and, after a twenty four (24) month period of interest only payments (at the non-default rate), be paid the contractual amount of principal and interest based on the existing amortization. The maturity date and all other loan terms will not be altered. The Allowed Secured Claim shall be paid from operational revenue of the SPE and the SPA Contributions. Class 10 is Impaired.

11.    Class 11 – Secured Claim of Synartis Income Fund, LLC & Catalyst Synartis CP Master 4A-2023, LLC (CPH Claim 33 and CPH2 Claim 15)

Class 11 consists of the Allowed Secured Claim of Synartis Income Fund, LLC & Catalyst Synartis CP Master 4A-2023, LLC ("SIF") based on various loan documents. The Claim related to Class 11 was filed in the amount of $12,100,000.00.

In full satisfaction of the Class 11 Claim, the Holder shall retain its Liens with the Allowed Claim paid monthly at the Prime Rate with the following payment terms: (i) interest only for thirty six (36) months; (ii) monthly principal and interest based on a thirty (30) year amortization beginning in month thirty seven (37); and (iii) a final maturity date and balloon

payment due at the end of 10 years. The Allowed Secured Claim shall be paid from the Debtors' operational revenue and the PSA Contributions. Class 11 is Impaired.

12. <u>Class 12 – Secured Claim of Synartis Capital Management LLC (CPH Claim 30)</u>

Class 12 consists of the Allowed Secured Claim of Synartis Capital Management LLC ("Synartis Capital") based on various loan documents. The Claim related to Class 12 was filed in the amount of $2,500,000.

In full satisfaction of the Class 12 Claim, the Holder shall retain its Liens with the Allowed Claim paid monthly at the Prime Rate with the following payment terms: (i) interest only for thirty six (36) months; (ii) monthly principal and interest based on a thirty (30) year amortization beginning in month thirty seven (37); and (iii) a final maturity date and balloon payment due at the end of 10 years. The Allowed Secured Claim shall be paid from the Debtors' operational revenue and the PSA Contributions. Class 12 is Impaired.

13. <u>Class 13 – Secured Claim of Synartis Capital Management LLC (CPH Claim 32)</u>

Class 13 consists of the Allowed Secured Claim of Synartis Capital based on various loan documents. The Claim related to Class 13 was filed in the amount of $6,890, 778.

In full satisfaction of the Class 13 Claim, the Holder shall retain its Liens with the Allowed Claim paid monthly at the Prime Rate with the following payment terms: (i) interest only for thirty six (36) months; (ii) monthly principal and interest based on a thirty (30) year amortization beginning in month thirty seven (37); and (iii) a final maturity date and balloon payment due at the end of 10 years. The Allowed Secured Claim shall be paid from the Debtors' operational revenue and the PSA Contributions. Class 13 is Impaired.

14.     Class 14 – Secured Claim of Capital Income Fund 2022-1A, LLC (CPH Claim 26)

Class 14 consists of the Allowed Secured Claim of Capital Income Fund 2022-1A, LLC ("Capital Income") based on various loan documents. The Claim related to Class 14 was filed in the amount of $2,380,000.

In full satisfaction of the Class 14 Claim, the Holder shall retain its Liens with the Allowed Claim paid monthly at the Prime Rate with the following payment terms: (i) interest only for thirty six (36) months; (ii) monthly principal and interest based on a thirty (30) year amortization beginning in month thirty seven (37); and (iii) a final maturity date and balloon payment due at the end of 10 years. The Allowed Secured Claim shall be paid from the Debtors' operational revenue and the PSA Contributions. Class 14 is Impaired.

15.     Class 15 – Secured Claim of Catalyst Synartis MF B Series Condo 3A-2023, LLC (CPH Claim 27)

Class 15 consists of the Allowed Secured Claim of Catalyst Synartis MF B Series Condo 3A-2023, LLC ("Catalyst Synartis Condo") based on various loan documents. The Claim related to Class 15 was filed in the amount of $4,935,000.

In full satisfaction of the Class 15 Claim, the Holder shall retain its Liens with the Allowed Claim paid monthly at the Prime Rate with the following payment terms: (i) interest only for thirty six (36) months; (ii) monthly principal and interest based on a thirty (30) year amortization beginning in month thirty seven (37); and (iii) a final maturity date and balloon payment due at the end of 10 years. The Allowed Secured Claim shall be paid from the Debtors' operational revenue and the PSA Contributions. Class 15 is Impaired.

16.    Class 16 – Secured Claim of Catalyst Synartis MF B Series MF 2A-2022, LLC (CPH Claim 28)

Class 16 consists of the Allowed Secured Claim of Catalyst Synartis MF B Series MF 2A-2022, LLC ("Catalyst Synartis B Series") based on various loan documents. The Claim related to Class 16 was filed in the amount of $5,300,000.

In full satisfaction of the Class 16 Claim, the Holder shall retain its Liens with the Allowed Claim paid monthly at the Prime Rate with the following payment terms: (i) interest only for thirty six (36) months; (ii) monthly principal and interest based on a thirty (30) year amortization beginning in month thirty seven (37); and (iii) a final maturity date and balloon payment due at the end of 10 years. The Allowed Secured Claim shall be paid from the Debtors' operational revenue and the PSA Contributions. Class 16 is Impaired.

17.    Class 17 – Secured Claim of ARCISCAP Celebration Pointe Investment (B.V.I.) Limited (CPH Claim 15)

Class 17 consists of the Allowed Secured Claim of ARCISCAP Celebration Pointe Investment (B.V.I.) Limited ("ARCISCAP") based on various loan documents.  The Claim related to Class 17 was filed in the amount of $44,054,216.55.

In full satisfaction of the Class 17 Claim, the Holder shall be paid, from the PSA Contributions, the amount of $15,000,000 upon the Effective Date. Class 17 is Impaired.

18.    Class 18 – Secured Claim of Iceberg Real Estate Investments, LLC (CPH Claim 34, CPH2 Claim 13, and SHD Claim 6)

Class 18 consists of the Allowed Secured Claim of Iceberg Real Estate Investments, LLC ("Iceberg") based on alleged obligations owed by Debtors arising from certain SPE investments. The Claims related to Class 18 were filed in the amount of $1,050,000.

In full satisfaction of the Allowed Class 18 Claim, the Holder will receive payments based a 10 year amortization and maturity, paid monthly, with interest at Prime. The

Allowed Secured Claim shall be paid from the Debtors' operational revenue and the PSA Contributions. Class 18 is Impaired.

19.    Class 19 – Secured Claim of James B. Euliano, as Trustee of the Neil R. Euliano Irrevocable Trustee JBE dated December 28, 2009, and Neil R. Euliano, as Trustee of the Neil R. Euliano Irrevocable Trust NRE II dated December 28, 2009 (SHD Claim 1 and SHD Claim 2)

Class 19 consists of the Allowed Secured Claims of James B. Euliano, as Trustee of the Neil R. Euliano Irrevocable Trust JBE dated December 28, 2009, and Neil R. Euliano, as Trustee of the Neil R. Euliano Irrevocable Trust NRE II dated December 28, 2009 (collectively, the "Euliano Trusts") based on promissory notes and pledges executed by SHD. The Claims related to Class 19 were filed in the total amount of $1,084,420.08.

In full satisfaction of the Class 19 Claim, the Holder will receive payments based a 10 year amortization and maturity, paid monthly, with interest at Prime. The Allowed Claim shall be paid from the Debtors' operational revenue and the PSA Contributions. Class 19 is Impaired

20.    Class 20 – Secured Claim of Jon Guven and J&R Investments, LLC (CPH Claim 13)

Class 20 consists of the Allowed Secured Claims of Jon Guven and J&R Investments, LLC  (collectively, "J&R") based on an agreement and guaranty. The Claim related to Class 20 was filed in the amount of $6,500,000.

In full satisfaction of the Class 20 Claim, the Holder shall retain its Liens with the Allowed Claim paid monthly at the Prime Rate with the following payment terms: (i) interest only for thirty six (36) months; (ii) monthly principal and interest based on a thirty (30) year amortization beginning in month thirty seven (37); and (iii) a final maturity date and balloon

payment due at the end of 10 years. The Allowed Secured Claim shall be paid from the Debtors' operational revenue and the PSA Contributions. Class 20 is Impaired.

21.  <u>Class 21 – Secured Claim of Kenneth R. McGurn and Linda C. McGurn</u>

Class 21 consists of the Allowed Secured Claims of Kenneth R. McGurn and Linda C. McGurn  (collectively, "McGurn") based on various loan documents and pledges. The Class 21 Claim is in the amount of $8,400,000.

In full satisfaction of the Class 21 Claim, the Holder will retain its lien and have any past due amounts paid on the Effective Date. Thereafter, the Holder will continue to receive payments pursuant to existing loan documents which call for interest only payments based on a rate of twelve percent (12%) per annum. The Allowed Secured Claims shall be paid from the Debtors' operations and the PSA Contributions. Class 21 is Impaired.

22.  <u>Class 22 – Secured Claim of Gainesville PropCo LLC (CPH2 Claim 8)</u>

Class 22 consists of the Allowed Secured Claim of Gainesville PropCo LLC ("Gainesville PropCo") based on a prepetition escrow and purchase agreement. The Claim related to Class 22 were filed in the amount of $400,224.13.

In full satisfaction of the Class 22 Claim, the Holder shall retain its lien and contract rights and be paid pursuant to the original contract terms. Class 22 is Impaired.

23.  <u>Class 23 – Secured Claim of Gainesville PropCo LLC (CPH Claim 25 and CPH2 Claim 9)</u>

Class 23 consists of the Allowed Secured Claims of Gainesville PropCo based on a prepetition escrow and purchase agreement. The Claims related to Class 23 were filed in the amount of $372,529.88.

In full satisfaction of the Class 23 Claim, the Holder shall retain its lien and contract rights and be paid pursuant to the original contract terms. Class 23 is Impaired.

24.    <u>Class 24 – Secured Claim of FDOT's State Infrastructure Bank</u>

Class 24 consists of the Allowed Secured Claims of FDOT's State Infrastructure Bank ("SIB") based on various loan documents including a credit agreement, security agreement, mortgages, and pledges. The amount of the Class 24 Claim is scheduled as secured in the amount of $21,762,578.

In full satisfaction of the Class 24 Claim, the Holder shall retain its liens and rights in respect of a letter of credit and be paid as follows: (i) past due interest will be added to the principal balance; (ii) ,monthly payments of interest at the non-default contract rate for 120 months; (iii) interest payments initially made form the SIB's $1,900,000 interest reserve; (iv) beginning year 11, remaining balance paid monthly based on 20 year amortization; and (v) final payment due at month 360.

The Allowed Secured Claims shall be paid from the Debtors' funds operational revenue and the PSA Contributions. Class 24 is Impaired.

25.    <u>Class 25 – Secured Claim of Florida Credit Union (CPH Claim 10)</u>

Class 25 consists of the Allowed Secured Claim of Florida Credit Union ("FCU") based on various loan documents including a note and mortgage secured by the SPE that owns the real property where the Hotel Indigo is located. The Claim related to Class 25 was filed in the amount of $17,512,084.66.

In full satisfaction of the Class 25 Claim, the Holder shall retain its lien and continue to be paid pursuant to the existing note and mortgage. Any past due amounts will be paid on the Effective Date. The Allowed Secured Claim shall be paid from the operational revenue from the SPE, which owns the real property, and the PSA Contributions. Class 25 is Impaired.

26.     Class 26 – Secured Claim of Barwick Banking Company

Class 26 consists of the Allowed Secured Claim of Barwick Banking Company ("Barwick") based on various loan documents including a note and security agreement. The loan relates to an obligation secured by a deposit account which serves as a backup for a letter of credit issued by Barwick in favor of the SIB.

In full satisfaction of the Class 26 Claim, the Holder shall retain its lien and continue to be paid interest at the contract terms. The maturity of the loan will be extended to coincide with the maturity of the SIB loan. The Allowed Secured Claim shall be paid from the Debtors' funds available and operational revenue. Class 26 is Impaired.

27.     Class 27 – Secured Claim of Johnson Controls Security Solution

Class 27 consists of the Allowed Secured Claim of Johnson Controls Security Solution ("Johnson Controls") based on a lien on certain equipment owned by Debtors.  Debtors scheduled the Class 27 Claim in the amount of $131,924.

In full satisfaction of the Class 27 Claim, the Holder will retain its lien and be paid over sixty (60) monthly payments of principal and interest with interest at the Prime Rate. The Allowed Secured Claim shall be paid from the Debtors' operational revenue. Class 27 is Impaired.

28.     Class 28 – Secured Claim of State Board of Administration of Florida

Class 28 consists of the Allowed Secured Claim of State Board of Administration of Florida  (collectively, "SBAF") and relates to an escrow account maintained by SBAF as collateral for the Class 24 Claim.

In full satisfaction of the Class 28 Claim, the Holder shall retain its lien with the escrow funds used pursuant to the treatment set forth for Class 24. Class 28 is Impaired.

B.    **Unsecured Claims.**

1.    <u>Class 29 – General Allowed Unsecured Claims</u>

Class 29 consists of all Allowed General Unsecured Claims (as defined above and in the Plan) against the Debtors in an approximate amount of $1,500,000.00. In full satisfaction of the Allowed Class 29 Claims, Holders of such Claims shall receive a pro rata share of the Cash Flow Note paid quarterly.

In the event of a conversion and liquidation, there would be likely no distribution to Holders of Allowed Class 29 Claims as the debt encumbering assets exceeds the value of such assets. Class 29 is Impaired.

2.    <u>Class 30 – Allowed Insiders and Affiliates' Claims</u>

Class 30 consists of the Allowed Claims of Insiders and Affiliates, including but not limited to, SHD Real Estate LLC, SHD Vue Investments LLC, Viking Student Housing Partners LLC, GNV RE Fund 3 LLC, SDPS Real Estate Investments II LLC, CP City Place Partners LLC, Viking Property Management LLC, Viking Companies LLC, Viking Construction Company of Florida LLC, SHD Management LLC, SDPS Real Estate Investments  LLC, SDPS Real Estate Investments IV LLC, Svein Dyrkolbotn and/or related entities, Patricia A. Shively and Patricia Ann Shively Trust. In full satisfaction of the Allowed Class 30 Claims, the Holders shall receive a note for the respective Allowed Amounts with the note accruing interest at the Prime Rate with a balloon payment due at the maturity of 120 months. Class 30 is Impaired.

C.    **Equity Interests**

1.    <u>Class 31 – Equity Ownership Interests</u>

Class 31 consists of any and all ownership interests currently issued or authorized in the Debtors. On the Effective Date, all existing Interests shall continue into the respective Reorganized Debtor. Class 31 is Unimpaired.

## VI.     ARTICLE VI - MEANS OF IMPLEMENTATION

### A.     Leases and Executory Contracts

To the extent Debtors reject any executory contracts or unexpired leases prior to the Confirmation Hearing, any party asserting a Claim, pursuant to section 365 of the Bankruptcy Code, arising from the rejection of an executory contract or lease shall file a proof of such Claim within thirty (30) days after the entry of an Order rejecting such contract or lease. The Debtors shall have through and including the Confirmation Hearing within which to assume or reject any unexpired lease or executory contract. To the extent the Debtors do not file a motion to reject prior to the Confirmation Hearing, any such executory contract or lease will be deemed assumed with any required cure to occur over six (6) months from the Effective Date.

### B.     Business Operations and Cash Flow

The Plan contemplates that the Debtors will continue to operate and manage their properties. Overall, the Debtors will support the development of the Project and, through revenue and the PSA Contributions will make any necessary Plan Payments including amounts need to cover shortfalls of the SPE related obligations. The Debtors believe the cash flow generated from operations following the restructuring of debt plus the PSA Contributions, will be sufficient to make all Plan Payments and will be sufficient to pay ordinary course expenses, including but not limited to, payroll and administrative costs.

### C.     Funds Generated During Chapter 11

Funds generated from operations through the Effective Date will be used for Plan Payments; however, the Debtors 'cash on hand as of Confirmation will be available for payment of Administrative Expenses.

D.        **Disbursing Agent**

The Reorganized Debtors will serve as the Disbursing Agent for all Distributions under the Plan.

E.        **Management and Control of the Reorganized Debtors**

The operations of the Reorganized Debtors will continue to be overseen by the current officers, managers, and directors following Confirmation, who will have uninterrupted authorization to maintain and manage the day-to-day normal business operations of the Reorganized Debtors with all the powers and duties as set forth in the Debtors' operating agreements.

F.        **Other Provisions**

1.        Procedures For Resolving Disputed Claims

a)        *Prosecution of Objections to Claims*

Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, and except as otherwise provided in the Plan, pursuant to the Consensual Plan Terms the Debtors shall have the primary responsibility to make and file objections to all Claims, other than those Claims deemed as "Allowed" under the terms of the Plan, and for proposing resolutions for Claim objections. The Debtors/Reorganized Debtors shall have a 150-day timetable from the confirmation Effective Date in order to complete the Claims allowance/disallowance process. The expenses of the Debtors, Reorganized Debtors, or their counsel related to the claims process shall be paid by the Reorganized Debtors.

Except as may be specifically set forth in the Plan, nothing in the Plan, the Disclosure Statement, the Confirmation Order, or any order in aid of Confirmation, shall constitute, or be deemed to constitute, a waiver or release of any claim, cause of action, right of

setoff, or other legal or equitable defense that the Debtors had immediately prior to the commencement of the Bankruptcy Case against or with respect to any Claim or Equity Interest, with the exception of claims against any creditor who holds a stipulated and Allowed Claim under the Plan. Except as set forth in the Plan, upon Confirmation the Debtors shall have, retain, reserve and be entitled to assert all such claims, Causes of Action, rights of setoff and other legal or equitable defenses that the Debtors had immediately prior to the commencement of the Bankruptcy Cases as if the Bankruptcy Cases had not been commenced.

b)     _Estimation of Claims_

Pursuant to the Plan, the Debtors may, at any time, request that the Bankruptcy Court estimate any contingent, disputed, or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection; and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event the Bankruptcy Court estimates any contingent, disputed, or unliquidated Claim, that estimated amount will constitute either the Allowed Amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim.

c)     _Cumulative Remedies_

In accordance with the Plan, all of the aforementioned Claims, objections, estimation, and resolution procedures are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or

32

resolved by any mechanism approved by the Bankruptcy Court. Until such time as an Administrative Claim, Claim, or Equity Interest becomes an Allowed Claim, such Claim shall be treated as a Disputed Administrative Claim, Disputed Claim, or Disputed Equity Interest for purposes related to allocations, distributions, and voting under the Plan.

d)      *Payments and Distributions on Disputed Claims*

As and when authorized by a Final Order, Disputed Claims or Interests that become "Allowed" shall be paid by the Reorganized Debtors such that the Holder of such Allowed Claim or Interest receives all payments and distributions to which such Holder is entitled under the Plan in order to bring payments to the affected Claimants current with the other participants in the particular Class in question. Except as otherwise provided in the Plan, no partial payments and no partial distributions will be made with respect to a Disputed Claim or Interest until the resolution of such dispute by settlement or Final Order. Unless otherwise agreed to by the Reorganized Debtors or as otherwise specifically provided in the Plan, a Creditor or Equity Interest Holder who holds both an Allowed Claim and a Disputed Claim or Interest will not receive a distribution until such dispute is resolved by settlement or Final Order.

e)      *Allowance of Claims and Interests*

(1)      Disallowance of Claims

According to the Plan, all Claims held by entities against whom the Debtors have obtained a Final Order establishing liability for a cause of action under sections 542, 543, 522(f), 522(h), 544, 545, 547, 548, 549, or 550 of the Bankruptcy Code shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not vote to accept or reject the Plan, both consequences to be in effect until such time

as such causes of action against that entity have been settled or resolved by a Final Order and all sums due the Debtors by that Entity are turned over to the Debtors.

(2)      Allowance of Claims

Except as expressly provided in the Plan, no Claim or Equity Interest shall be deemed Allowed by virtue of the Plan, Confirmation, or any Order of the Bankruptcy Court in the Bankruptcy Cases, unless and until such Claim or Equity Interest is deemed Allowed under the Bankruptcy Code or the Bankruptcy Court enters a Final Order in the Bankruptcy Cases allowing such Claim or Equity Interest.

(3)      Chapter 5 Claims

Pursuant to the Consensual Plan Terms, on the Effective Date, the Debtor/Reorganized Debtors shall release all chapter 5 claims against the SPE, all Affiliates, and all officers and directors of the Debtors.

f)      *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Equity Interests or any Class of Claims or Equity Interests are Impaired under the Plan, the Bankruptcy Court, after notice and a hearing, shall determine such controversy before the Confirmation Date. If such controversy is not resolved prior to the Effective Date, the Debtors' interpretation of the Plan shall govern.

2.      Effect of Confirmation

a)      *Authority to Effectuate the Plan*

Upon the entry of the Confirmation Order by the Bankruptcy Court, the Plan provides that all matters provided for under the Plan will be deemed to be authorized and approved without further approval from the Bankruptcy Court. Unless otherwise noted herein,

34

the Reorganized Debtors shall be authorized, without further application to or order of the Bankruptcy Court, to take whatever action is necessary to achieve Consummation and carry out the Plan.

### b) *Post-Confirmation Status Report*

Within ninety (90) days of the entry of the Confirmation Order, the Reorganized Debtors will file a status report with the Bankruptcy Court explaining what progress has been made toward consummation of the confirmed Plan. The status report will be served on the United States Trustee, and those parties who have requested special notice post-confirmation. The Bankruptcy Court may schedule subsequent status conferences in its discretion.

## VII.    ARTICLE VII - CONFIRMATION

### A.    Confirmation Hearing

Section 1128 of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a Confirmation Hearing on the Plan at which time any party in interest may be heard in support of or in opposition to Confirmation. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement to be made at the Confirmation Hearing.

Any objection to Confirmation must be made in writing and filed with the Clerk, and delivered to the following persons, at least seven (7) days prior to Confirmation Hearing:

| Counsel for the Debtor: | Debtors: |
|---|---|
| R. Scott Shuker, Esquire<br>Shuker & Dorris, P.A.<br>121 S. Orange Avenue, Suite 1120<br>Orlando, Florida 32801 | Svein H. Dyrkolbotn, Manager<br>5001 Celebration Pointe Ave., Suite 180<br>Gainesville, FL 32608 |

| United States Trustee: | Counsel for the Committee: |
|---|---|
| United States Trustee<br>Office of The United States Trustee<br>110 East Park Avenue, Suite 128<br>Tallahassee, FL 32301 | N/A |

### B.    Financial Information Relevant to Confirmation

Attached as exhibits to this Disclosure Statement, and incorporated herein, are the following:

1.    A copy of the Debtors' financial projections (the "Projections") for the three (3) years following confirmation of the Plan is attached hereto as **Exhibit "A"**.[4] The Projections demonstrate that the Debtors' cash flow from operations plus the PSA Contributions will be sufficient to service the required Plan Payments. The Projections may not be relied upon as a guaranty or other assurance of the actual results that will occur as they are based upon a variety of estimates and assumptions which may not be realized; and

2.    Debtors' chapter 7 liquidation analysis (the "Liquidation Analysis") is attached hereto as **Exhibit "B"**.[5] The Liquidation Analysis demonstrates that Creditors will receive under the Plan an amount not less than the amount that such Holder would receive or retain if the Debtors were liquidated under chapter 7.

---

[4] The Projections will be filed at least one (1) day prior to the deadline for service of the solicitation package which will be set by the Bankruptcy Court.

[5] The Liquidation Analysis will be filed at least one (1) day prior to the deadline for service of the solicitation package which will be set by the Bankruptcy Court.

### C.    Confirmation Standards

For a plan of reorganization to be confirmed, the Bankruptcy Code requires, among other things, that a plan be proposed in good faith and complies with the applicable provisions of chapter 11 of the Bankruptcy Code. Section 1129 of the Bankruptcy Code also imposes requirements that at least one class of Impaired Claims accept the plan, that confirmation of the plan be in the best interests of creditors, and that a plan be fair and equitable with respect to each class of Claims or Interests which is Impaired under the plan.

The Bankruptcy Court shall confirm a plan only if it finds that all the requirements enumerated in section 1129 of the Bankruptcy Code have been met. The Debtors believe that the Plan satisfies all the requirements for Confirmation.

### 1.    Best Interests Test

Before the Plan may be confirmed, the Bankruptcy Court must find (with certain exceptions) that the Plan provides, with respect to each Class, that each Holder of an Allowed Claim of such Class either (a) has accepted the Plan or (b) will receive or retain under the Plan on account of such Claim, property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if Debtors were, on the Effective Date, liquidated under chapter 7 of the Bankruptcy Code. The Debtors believe that satisfaction of this test is established by the Liquidation Analysis.

To determine what Holders of Claims would receive if the Debtors were liquidated, the Bankruptcy Court must determine how the assets and properties of the Debtors would be liquidated and distributed in the context of a chapter 7 liquidation case. The Debtors' costs of liquidation under chapter 7 would include the fees payable to a trustee in bankruptcy and to any additional attorneys and other professionals engaged by such trustee and any unpaid

expenses incurred by the Debtors during the Bankruptcy Cases, including compensation of attorneys and accountants. The additional costs and expenses incurred by a trustee in a chapter 7 liquidation could be substantial and would decrease the possibility that Unsecured Creditors would receive any meaningful distribution. The foregoing types of Claims arising from chapter 7 administration and such other Claims as may arise in chapter 7 or result from the pending Bankruptcy Cases would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay the Claims of Unsecured Creditors. Liquidation in chapter 7 might substantially delay the date at which Creditors would receive any Payment.

        The Debtors have carefully considered the probable effects of liquidation under chapter 7 on the ultimate proceeds available for distribution to Creditors, including the following:

    a.    the possible costs and expenses of the chapter 7 trustee or trustees;

    b.    the possible adverse effect on recoveries by Creditors under chapter 7 due to reduced sale prices for the Debtors' assets caused by the forced chapter 7 liquidation;

    c.    the loss of the going-concern value of the Debtors' businesses; and

    d.    the possible substantial increase in Claims, which would rank prior to or on parity with those of Unsecured Creditors.

    2.    <u>Financial Feasibility</u>

        The Bankruptcy Code requires, as a condition to Confirmation, that Confirmation of a plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors unless the liquidation is proposed in the Plan. Debtors believe that its cash flow from operations plus the PSA Contributions will be sufficient to make

all Plan Payments noted herein. Based upon the Projections, Debtors assert that the Plan is feasible, and Confirmation is not likely to be followed by further financial reorganization.

      3.      <u>Acceptance by Impaired Classes</u>

The Bankruptcy Code requires as a condition to Confirmation that each Class of Claims or Interests that is Impaired under the Plan accept such plan, with the exception described in the following section. A Class of Claims has accepted the Plan if the Plan has been accepted by Creditors that hold at least two-thirds (2/3) in dollar amount and more than one-half (½) in number of the Allowed Claims of such Class who vote to accept or to reject the Plan.

A Class of Interests has accepted the Plan if the Plan has been accepted by Holders of Interests that hold at least two-thirds (2/3) in amount of the Allowed Interests of such Class that vote to accept or reject the Plan. Holders of Claims or Interests who fail to vote are not counted as either accepting or rejecting the Plan.

A Class that is not Impaired under the Plan is deemed to have accepted the Plan; solicitation of acceptances with respect to such Class is not required. A Class is Impaired unless (i) the legal, equitable and contractual rights to which the Claim or Interest entitles the Holder of such Claim or Interest are not modified; (ii) with respect to Secured Claims, the effect of any default is cured and the original terms of the obligation are reinstated; or (iii) the Plan provides that on the Effective Date the Holder of the Claim or Interest receives on account of such claim or interest, Cash equal to the Allowed Amount of such Claim or, with respect to any Interest, any fixed liquidation preference to which the Holder is entitled.

      4.      <u>Confirmation Without Acceptance by all Impaired Classes: "Cramdown"</u>

The Bankruptcy Code contains provisions that enable the Bankruptcy Court to confirm the Plan, even though the Plan has not been accepted by all Impaired Classes, provided

that the Plan has been accepted by at least one (1) Impaired Class of Claims. Section 1129(b)(1) of the Bankruptcy Code states:

> Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

This section makes clear that the Plan may be confirmed, notwithstanding the failure of an Impaired Class to accept the Plan, so long as the Plan does not discriminate unfairly, and it is fair and equitable with respect to each Class of Claims that is Impaired under, and has not accepted, the Plan.

**DEBTORS BELIEVE THAT, IF NECESSARY, THEY WILL BE ABLE TO MEET THE STATUTORY STANDARDS SET FORTH IN THE BANKRUPTCY CODE WITH RESPECT TO THE NONCONSENSUAL CONFIRMATION OF THE PLAN AND WILL SEEK SUCH RELIEF.**

**D.      Consummation**

The Plan will be consummated, and Payments made if the Plan is Confirmed pursuant to a Final Order of the Bankruptcy Court and the Effective Date occurs. It will not be necessary for the Reorganized Debtors to await any required regulatory approvals from agencies or departments of the United States to consummate the Plan. The Plan will be implemented pursuant to its provisions and the Bankruptcy Code.

**VIII.   ARTICLE VIII – MISCELLANEOUS PROVISIONS**

**A.      Conditional Injunction.**

**THE PLAN IS PREMISED UPON THE CONDITIONAL GUARANTY INJUNCTIONS CONTAINED HEREIN. THE GUARANTY INJUNCTIONS SHALL APPLY TO THE SPES, DYRKOLBOTN, SHIVELY, AND ANY ENTITY OR AFFILIATE OWNED BY DEBTORS (THE "GUARANTOR PARTIES"). THE INJUNCITONS ARE CRITICAL TO ALLOWING DYRKOLBOTN AND SHIVELY TO PERROM UNDER**

THE PSA AND TO FUND SIGFNIFICANT AMOUNTS NECESSARY TO MAKE ALL PLAN PAYMENTS. THE DEBTORS ASSERT THESE CONDITIONAL INJUNCTIONS ARE BEING GIVEN AS CONSIDERATION FOR THE ACCOMMODATIONS PROVIDED BY THE GUARANTOR PARTIES UNDER THE PLAN AND ARE FAIR CONSIDERATION FOR PROPERTY CONTRIBUTED AND VALUABLE SERVICES. THE DEBTORS FURTHER BELIEVE THAT UNLESS THE PLAN IS BINDING ON ALL PARTIES THROUGH CONFIRMATION AND CONSUMMATION OF THE PLAN, WHICH PROTRACTED AND COSTLY LITIGATION COULD ENSUE, DISTRIBUTIONS TO CREDITORS WOULD BE SUBSTANTIALLY DELAYED, GIVE RISE TO INDEMNITY CLAIMS, AND THE DEBTORS WOULD NOT BE ABLE TO RESTRUCTURE AND REORGANIZE AS CONTEMPLATED BY THIS PLAN. SO LONG AS THE DEBTORS AND GUARANTOR PARTIES ARE NOT IN DEFAULT OF ANY OBLIGATION UNDER THE PLAN OR ANY AGREEMENTS CONTEMPLATED BY THE PLAN, UPON CONFIRMATION OF THE PLAN, ALL PERSONS AND ENTITIES THAT HAVE HELD, CURRENTLY HOLD OR MAY HOLD A CLAIM, OTHER DEBT OR LIABILITY, AN INTEREST, OR OTHER RIGHT OF AN EQUITY SECURITY THAT IS IMPAIRED OR TERMINATED PURSUANT TO THE TERMS OF THE PLAN, ARE ENJOINED, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, FROM TAKING ANY OF THE FOLLOWING ACTIONS ON ACCOUNT OF ANY SUCH IMPAIRED OR TERMINATED CLAIMS, DEBTS OR LIABILITIES, INTERESTS OR RIGHTS AGAINST THE GUARANTOR PARTIES: (I) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR PROCEEDING AGAINST THE GUARANTOR PARTIES, OR THEIR PROPERTY INTERESTS, OTHER THAN TO ENFORCE ANY RIGHT PURSUANT TO THE PLAN; (II) ENFORCING, ATTACHING, COLLECTING OR RECOVERING IN ANY MANNER ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST THE GUARANTOR PARTIES, OR THEIR PROPERTY INTERESTS, OTHER THAN AS PERMITTED PURSUANT TO (I) ABOVE; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE AGAINST THE GUARANTOR PARTIES OR THEIR PROPERTY INTERESTS; (IV) ASSERTING A SETOFF, RIGHT OF SUBROGATION OR RECOUPMENT OF ANY KIND AGAINST ANY DEBT, LIABILITY OR OBLIGATION DUE TO THE GUARANTOR PARTIES; AND (V) COMMENCING OR CONTINUING ANY ACTION, IN ANY MANNER, IN ANY PLACE THAT DOES NOT COMPLY WITH OR IS INCONSISTENT WITH THE PROVISIONS OF THE PLAN. FROM AND AFTER THE CONFIRMATION DATE, THE CONDITIONAL INJUNCTIONS DESCRIBED HEREIN SHALL BECOME EFFECTIVE, AND ALL HOLDERS OF CLAIMS AND INTERESTS SHALL BE ENJOINED FROM COMMENCING OR CONTINUING ANY OF THE ACTIONS DETAILED HEREIN FOR SO LONG AS THE REORGANIZED DEBTORS AND THE GUARANTOR PARTIES REMAIN IN COMPLIANCE WITH THE PLAN OR ANY AGREEMENTS CONTEMPLATED BY THE PLAN AND EXCEPT AS SPECIFICALLY PROVIDED FOR IN THE PLAN.

### B.    Exculpation from Liability

The Debtors, and their officers, directors, members, managers, managing members, and Professionals, including each member of the Committee and its retained professionals, (acting in such capacity) shall neither have nor incur any liability whatsoever to any Person or Entity for any act taken or omitted to be taken in good faith in connection with or related to the formulation, preparation, dissemination, or confirmation of the Plan, the Disclosure Statement, any Plan Document, or any contract, instrument, release, or other agreement or document created or entered into, or any other act taken or omitted to be taken, in connection with the plan or the Bankruptcy Case; *provided*, *however*, that this exculpation from liability provision shall not be applicable to any liability found by a court of competent jurisdiction to have resulted from fraud or the willful misconduct or gross negligence of any such party. With respect to the Professionals, the foregoing exculpation from liability provision shall also include claims of professional negligence arising from the services provided by such Professionals during the Bankruptcy Cases. The rights granted hereby are cumulative with (and not restrictive of) any and all rights, remedies, and benefits that the Debtors, the Reorganized Debtors, and its respective agents have or obtain pursuant to any provision of the Bankruptcy Code or other applicable law, or any agreement. This exculpation from liability provision is an integral part of the Plan and is essential to its implementation. Notwithstanding anything to the contrary contained herein, the provisions hereof shall not release or be deemed a release of any of the Causes of Action otherwise preserved by the Plan. The terms of this exculpation shall only apply to liability arising from actions taken on or prior to the Effective Date.

**ANY BALLOT VOTED IN FAVOR OF THE PLAN SHALL ACT AS CONSENT BY THE CREDITOR CASTING SUCH BALLOT TO THIS EXCULPATION FROM LIABILITY PROVISION. MOREOVER, ANY CREDITOR WHO DOES NOT VOTE IN FAVOR OF THE PLAN AND WHO HOLDS A CLAIM THAT MAY BE AFFECTED BY THIS EXCULPATION FROM LIABILITY PROVISION MUST FILE A CIVIL ACTION IN THE BANKRUPTCY COURT OR ANY OTHER COURT OF COMPETENT JURISDICTION ASSERTING SUCH LIABILITY WITHIN NINETY (90) DAYS FOLLOWING THE EFFECTIVE DATE OR SUCH CLAIMS SHALL BE FOREVER BARRED; *PROVIDED THAT*, THE FOREGOING TIME LIMITATION SHALL NOT APPLY TO CLAIMS OF FRAUD, GROSS NEGLIGENCE, OR WILLFUL OR GROSS MISCONDUCT IN THE FORMULATION, PREPARATION, DISSEMINATION, OR CONFIRMATION OF THE PLAN. THE TIME TO BRING SUCH CLAIMS SHALL BE GOVERNED BY THE APPLICABLE STATUTE OF LIMITATION.**

Notwithstanding the foregoing, (i) the Reorganized Debtors shall remain obligated to make payments to Holders of Allowed Claims as required pursuant to the Plan, and (ii) the Debtors' members, managers or executive officers shall not be relieved or released from any personal contractual liability except as otherwise provided in the Plan.

## C.    Police Power

No provision of Article VIII shall be deemed to effect, impair, or restrict any federal or state governmental unit from pursuing its police or regulatory enforcement action against any person or entity, other than to recover monetary claims against the Debtors for any act, omission, or event occurring prior to Confirmation Date to the extent such monetary claims are discharged pursuant to section 1141 of the Bankruptcy Code.

## D.    Revocation and Withdrawal of this Plan

The Debtors reserve the right to withdraw this Plan and Disclosure Statement at any time before entry of the Confirmation Order. If (i) the Debtors revoke and withdraw this Plan, (ii) the Confirmation Order is not entered, (iii) the Effective Date does not occur, (iv) this Plan is not substantially consummated, or (v) the Confirmation Order is reversed or revoked, then this Plan shall be deemed null and void.

E.    **Modification of Plan**

The Debtors may seek to amend or modify this Disclosure Statement and the Plan in accordance with section 1127(b) of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.

On or before substantial consummation of the Plan, the Debtors may issue, execute, deliver, or file with the Bankruptcy Court, or record any agreements and other documents, and take any action as may be necessary or appropriate to effectuate, consummate and further evidence the terms and conditions of the Plan.

IX.    **ARTICLE IX - ALTERNATIVE TO THE PLAN**

If the Plan is not confirmed and consummated, the Debtors believe the most likely alternative is a liquidation of the Debtors' Assets under chapter 7 of the Bankruptcy Code. In a chapter 7 liquidation, there would be no assets to administer on behalf of unsecured creditors, and a chapter 7 trustee would likely incur significant Administrative Expenses that would be paid before any distribution to creditors. The Debtors therefore believe that liquidation of all real and personal property in a chapter 7 case would dramatically reduce the total amount available to Creditors as compared to reorganization under the Plan. In light of the foregoing, the Debtors recommend that Holders of Claims vote to accept the Plan.

**RESPECTFULLY SUBMITTED** this 28th day of June 2024.

/s/R. Scott Shuker
R. Scott Shuker, Esq.
Florida Bar No. 0984469
rshuker@shukerdorris.com
Lauren L. Stricker, Esq.
Florida Bar No. 91526
lstricker@shukerdorris.com
**SHUKER & DORRIS, P.A.**

44

121 S. Orange Avenue, Suite 1120
Orlando, Florida 32801
Tel: 407-337-2060
*Attorneys for the Debtors*