UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION
www.flnb.uscourts.gov

In re:

| | |
|---|---|
| CELEBRATION POINTE HOLDINGS, LLC | Case No. 24-10056-KKS |
| CELEBRATION POINTE HOLDINGS II, LLC | Case No. 24-10057-KKS |
| SHD-CELEBRATION POINTE, LLC | Case No. 24-10058-KKS |
| | Chapter 11 |
| Debtors. | Jointly Administered under Case No. 24-10056-KKS |

_____/

### OBJECTION TO CONFIRMATION

Creditor, Iceberg Real Estate Investments, LLC ("*Iceberg*"), by and through the undersigned counsel hereby files this Objection to Confirmation, and in support thereof states:

### SUMMARY OF POSITION

As set forth in further and substantial detail below, this bankruptcy process and the efforts by the Debtors, SHD Celebration Pointe, LLC ("*SHD*"), Celebration Pointe Holdings, LLC ("*CPH*") and Celebration Pointe Holdings II, LLC ("*CPH II*") (collectively, the "*Debtors*"), to reorganize are nothing more than an effort to prevent the investigation into the very significant and substantial misconduct of the principal and sole operator of the Debtor, Svein Dyrkolbotn, who has failed to account for or otherwise explain what has happened to the substantial revenue that is generated by the Shops at Celebration Pointe, LLC (the "*Shops*"), while seeking an injunction that somehow prevents Iceberg from exercising its rights as it relates to the Shops, which, **is not a Debtor**, and which has been mismanaged and subject to the misappropriation of significant and substantial assets. To avoid the disclosure of this misconduct, the Debtors have proposed a

bankruptcy plan that provides little if any detail, despite a history of a lack of feasibility, of how payments will be made, or creditors will be satisfied, yet grants Dyrkolbotn and any of the special purpose entities he owns or controls protection from claims. The basic and unconfirmable nature of this plan also demonstrates that it was filed in bad faith. All the foregoing conduct and matters mandate that a trustee or conservator be appointed, and that SHD be removed as the manager of the Shops.

## **BACKGROUND**

1.      Svein Dyrkolbotn ("***Dyrkolbotn***") is a real estate developer with substantial experience in management of real properties in Gainesville, Florida. He has been involved in the successful development of several projects that have yielded substantial profit.

2.      As a result of these efforts, Dyrkolbotn developed a series of investment vehicles that would allow him and other investors to share in the development and management of real property in Gainesville.

3.      As a result, in addition to his involvement in the Shops and Viking Student Housing, Dyrkolbotn has managed and is currently managing other similar commercial real estate projects, as is advertised under the umbrella of the Viking Companies. The Viking Companies website is fraudulent in itself in that it claims that Dyrkolbotn is involved in, or his affiliates are owners of, projects that he actually has no involvement with. Viking Companies is also a significant creditor in these cases.

4.      Amongst other enterprises, Dyrkolbotn has been involved intimately with the development of non-party, the Shops at Celebration Pointe, LLC, which is managed by SHD Celebration Pointe, LLC, and is owned by Iceberg, and co-debtors Celebration Pointe Holdings, LLC, and Celebration Pointe Holdings, II, LLC.

5.      Accordingly, and as set forth in the Amended Operating Agreement dated September 1, 2018, Iceberg currently holds 52.281% of the outstanding Class B shares of the Shops, with CPH holding 47.619% of the remaining class B shares. CPHII held 100% of the Class A shares, which were not granted priority rights under the Operating Agreement of the Shops.

### ICEBERG INVESTS IN THE SHOPS AT CELEBRATION POINTE

6.      Consistent with the parties understanding, on or about May 18, 2018, Iceberg, CPH, CPH II and SHD executed the Operating Agreement for the Shops.

7.      Under the terms of the Operating Agreement, as the Manager of The Shops, Dyrkolbotn through SHD agreed to manage and facilitate the development of a mixed use commercial real estate development project that would yield substantial revenue for the investors. Indeed, and as set forth in the operating agreement of the Shops, SHD, and Dyrkolbotn agreed that the Shops would pay SHD a total of $5,000 per month for (i) management of the Shops business; (ii) safekeeping the Company's property; (iii) ensuring that the Shops complied with all the aspects of the business; and (iii) conducting the Shops affairs in a way that represents the best interests of the Company. A true and correct copy of the Operating Agreement for the Shops is attached hereto as **Exhibit A**.

8.      The Operating Agreement also provides that (i) the manager may be removed by a unanimous vote of the individuals comprising the majority of the beneficial ownership of each Class B Member, **excluding**, Svein Dyrkolbotn, or any affiliate of Svein Dyrkolbotn, or any entity that is controlled by Dyrkolbotn. In addition, Dyrkolbotn and/or any company controlled by him shall be removed as the manager upon the following events: (i) bankruptcy; or (ii) a failure to cure a breach of the Operating Agreement, after receiving notice thereof. As set forth in substantial detail below, SHD, Dyrkolbotn and others engaged in significant and very serious misconduct that

has caused Iceberg to suffer damage, and that has deprived Iceberg of its rights under the Operating Agreement.

9.    In addition, the Operating Agreement provided in relevant part that distributions were to be made in with payments first going to Iceberg in the amount of ten percent per year of its capital contribution, such that Iceberg was to be paid first $100,500 annually, before CPH or CPH II could be paid anything, and was also entitled to 20.91% of any distributions of profit thereafter.

10.    The Operating Agreement contained additional and further restrictions as they applied to SHD and its management of the Shops. Notably, the Operating Agreement (i) prohibits SHD from borrowing money or engaging in any transactions whose value exceeds $100,000 without the majority of members consent; (ii) obligated SHD to provide Iceberg with documents and records concerning its operations upon request; (iii) prohibited SHD and the Shops from engaging in other transactions without the unanimous consent of all of the Shops members.  There were other additional limitations to the Agreements.

11.    SDH would collect rents for the Shops, and was responsible for developing them, and ensuring that they were properly maintained. SDH and Dyrkolbotn had an obligation to account for and use the income and proceeds generated from the Shops for a proper purpose and to avoid obtaining an improper personal benefit. As such, Dyrkolbotn and SDH also owed Iceberg Real Estate fiduciary duties.

12.    Shortly after receiving more than $1 million from Iceberg, SHD began to engage in conduct which otherwise constitutes a breach of the Operating Agreement and its fiduciary duties.

13.    SHD and Dyrkolbotn also hired companies that are affiliated with, controlled or are are otherwise owned by Dyrkolbotn to divert money to themselves. Dyrkolbotn also inflated the cost of construction and management of the Shops by improperly paying himself and his companies excessive amounts, diverting funds to themselves. SHD and Dyrkolbotn submitted different budgets to investors, banks and other construction companies to conceal what they were paying for the construction.

14.    Dyrkolbotn and SHD also caused the Shops to make distributions to CPH and CPH II in violation of the Shops' Operating Agreements. On information and belief, SHD and Dyrkolbotn caused the two entities to receive substantially more moneys from the Shops than they were entitled, to otherwise deprive Iceberg of its preferred distribution.

15.    As further evidence of falsification, in December 2021, SHD made a notation stating that the Shops had assumed a $7 million obligation from CPH on its balance sheets. SHD never disclosed that obligation to Iceberg nor did SHD obtain the approval of the other members of the Shops. To date, there has been no explanation, and no documentation to support the existence of the alleged indebtedness. The Debtors have also otherwise failed to provide Iceberg with complete access to the books and records of the Shops, which is a violation of the terms of the Operating Agreement.

16.    After distributions inexplicably stopped and Iceberg received a report showing that the total occupancy of the Shops had increased, Iceberg began to request and seek information that concerned or otherwise related to the management of the Shops and Dyrkolbotn's involvement with the Shops and the receipt of monies by him. Thus, there is no explanation for the failure to make payments or any diminution in rent.

17.     Dyrkolbotn and SHD, as the manager of the Shops refused to provide information, as was otherwise required by Fla. Stat. § 605.0410 and resulted in the filing by Iceberg of a lawsuit against them for their breaches of the Operating Agreement and breach of fiduciary duty. Viking Companies, an insider of the Debtor, has also received significant money from the Shops, and on information and belief claims to be owed money. At that time, Iceberg also demanded that Dyrkolbotn investigate or cause SHD to investigate the transactions which resulted in Dyrkolbotn getting an improper personal benefit.

18.     Based on the foregoing, Iceberg maintained and continues to maintain in good faith that SHD and Dyrkolbotn breached their fiduciary duties by diverting monies and converted monies from the Shops to themselves. Iceberg also has claims against CPH and CPH II to the extent they received improper distributions from the Shops. However, SHD, CPH and CPH II are not going to initiate or investigate claims against each other, because they are all controlled by Dyrkolbotn. There is also evidence to show that companies associated with Dyrkolbotn, that are also creditors in this case had performed substantial renovations onto Dyrkolbotn's house, which included the construction of a $1 million pool.

19.     Because Dyrkolbotn, SHD and the Shops were unwilling to provide information, and Iceberg had spent nearly a year trying to get documents to verify the condition of the Shops while it inexplicably stopped generating net income or providing K-1s, Iceberg filed the Amended Complaint, attached hereto as **Exhibit B**, against the Shops, Dyrkolbotn and others. The Amended Complaint was after Dyrkolbotn and SHD refused to investigate the misconduct detailed above and refused to provide transparency with respect to the Shops.

20.     Iceberg also issued discovery that related to or otherwise concerned transfers of money and/or benefits that Dyrkolbotn had received in connection with their operation of the

Shops. Dyrkolbotn and SHD refused to provide the information, despite being ordered to produce limited documents as set forth in the Order attached hereto as **Exhibit C**. Instead of providing a disclosure into the management of the Shops Dyrkolbotn and SHD went to extraordinary length of filing a petition for writ of certiorari with the First District Court of Appeal to prevent Iceberg from obtaining documents and uncovering SHD and Dyrkolbotn's fraudulent conduct and the misappropriation of assets by them.

21.    The Petition for a Writ of Certiorari was denied in its entirety, which is not surprising because there was no basis for the relief sought, as set forth in Iceberg's Response, which was accepted by the Court.  Notwithstanding the denial of the petition, there has been no effort to provide any transparency with respect to the management of the Shops.

22.    As such, Dyrkolbotn and SHD have continued to breach the Operating Agreement of SHD with respect to the instant cause by (i) failing to provide Iceberg with annual reports; (ii) failing to make the annual distributions; and (iii) by distributing money or wrongfully withholding distributions and cash that is on hand. The instant filing for bankruptcy exemplifies this conduct.

23.    On or about March 14, 2024, CPH, CPH II and the Shops all filed for bankruptcy. Pursuant to the terms of the Operating Agreement, the filing of bankruptcy disqualified SHD from acting or continuing to act as the manager of the Shops. Moreover, Iceberg has the absolute right to remove SHD from being a manager of the Shops if it has breached the Operating Agreement, as the sole member that is not affiliated with Dyrkolbotn, and Iceberg votes for its removal.

24.    After the bankruptcy was filed, Iceberg sought discovery from Dyrkolbotn and others that concerned the financial condition of the shops but faced opposition in seeking such information and materials. Some limited information was provided, but the parties conditioned discovery on Iceberg's agreement to not seek formal discovery. Thereafter, Iceberg sent to the

Debtors the correspondence, attached hereto as **Exhibit D**, to notify them of its intent to exercise its rights under the Operating Agreement and effectuate the removal of SHD as the Manager of the Shops. In response, the Debtors requested that Iceberg participate in a resolution but conditioned any efforts to resolve the matters on Iceberg's agreement to not to take discovery while negotiations were pending.

25.    Some limited records were produced during the process. The limited records show that between 2019 to 2024 more than $2 million was improperly paid to CPH and CPH II and SHD, with CPH appearing to claim to be owed $7,099,500.65 from the Shops through an undisclosed transaction on the books and records. There also appears to be millions of dollars of additional monies that were transferred to SHD, CPH and CPH II as "loans" that were actually distributions, in violation of the terms of the Operating Agreement. However, those reports and records also were incomplete, concerned a very limited set of transfers and transactions, and did not disclose or provide details concerning the costs of the development of the Shops.

26.    There is also a very significant and unexplained deficit in income that was generated by the Shops. According to the Debtor's reports, the Shops generated a net income of $772,128 in 2022 and of $477,395 in 2023.

27.    To date, the total revenue of the Shops in 2024 has yet to be disclosed. However, according to the Disclosure Statement, the Shops has lost approximately $13,000 in revenue since the Petition. There is no logical explanation for the decrease in rental income as the Shops has been fully leased, with rent at market or above market rates, since the completion of tenant improvements in 2023. The Shops was otherwise leased and has also generated hundreds of thousands of dollars of revenue each year, with a net income of $772,128 in 2022 despite having less tenants than it currently has.

28.     A significant number of former personnel have also reported and witnessed Dyrkolbotn diverting or causing services that were to be rendered to for the Shops to be provided to benefit him personally. Dyrkolbotn has also caused proceeds from the Shops to be used to benefit other entities which would otherwise constitute a fraudulent transfer as well.

29.     Simply put the amount of income that was otherwise available to the Shops **should have increased** in 2024, yet the business lost money. As a result, the only explanation for such a deficient performance is malfeasance or gross mismanagement.

30.     The Shops was also projected to provide some of the most consistent revenue in the Plan, such that if the reports concerning its current revenue is accurate then the Project as a whole must be in jeopardy of complete failure.

31.     And as stated, not only has there been a failure to disclose transactions concerning the matter, but there has been an extraordinary effort to prevent an investigation into those facts.

### THE DEBTORS' PERFORMANCE AND PLAN OF REORGANIZATION

32.     Since the filing of the instant petition, SHD has operated with a cumulative Profit of $222,208 [ECF No. 234 at 2][1], Celebration Pointe Holdings has operated at a cumulative loss of -$110,407 [ECF No. 233 at 2] and Celebration Point Holdings II has operated at a cumulative loss of -$651,300. Thus, since the filing of the instant bankruptcy case, the Debtors have lost more than $541,499 in value since the filing of the instant petition.

33.     Despite the lack of income generated, the Debtors have incurred $461,597.50 in attorney's fees, of which $220,548.67 was to be charged against a pre-petition retainer that was paid to the Debtor's counsel. As such the Debtor owes approximately $250,000 in administrative

---

[1] This is a distinction between the amounts in the profit and loss statements and the Debtors' operating reports with respect to the income generated.

expenses.

34.    Nonetheless, and despite that during the entire pendency of the instant case, the Debtor has failed to realize profits, the Debtor has proposed a plan under which the Debtors will have lost $2,907,551 in revenue by the effective date and will lose an additional $1,625,214 in revenue during the first year. Yet somehow the Debtor anticipates making $5,256,671 the following year, $3,875,141 the year after that, $1,001,876 the following year. These projections have no rhyme to them and are not based on the past performance of the Debtor.

35.    The Debtors' operating reports also reflect a series of intercompany indebtedness between CPH, SHD and CPH II. [ECF No. 244-1 at 3].

36.    The Disclosure Statement also demonstrates other problems with the potential for confirmation and demonstrates the fact that the plan cannot be confirmed. Specifically, the Plan contemplates that the Shops will pay SHD, CPH and CPH II $272,487 in 2025, $312,655 in 2026, $165,733 in 2027, $193,133 in 2028. The Debtor also claimed that it would obtain refinancing to generate and pay SHD, CPH and CPH II $1,934,194 in 2029, while maintaining that Patricia Shively ("*Shively*") a guarantor would be the source of the additional payment. Again, there is no explanation or disclosure as to where or how this payment will be made or contemplated, nor is there any reasonable explanation as to how the Debtors will meet those projections.

37.    However, the Plan and Disclosure Statement in their simplest form, seeks to amalgamate payments that are due to three distinct entities with different rights from twenty one different special purpose entities without regard to whether the Debtors are in fact allowed to receive money from those other entities, and regardless of whether SHD has in fact properly managed or otherwise been involved with the management of those entities, the Debtors are seeking and asking the Court to enjoin any other party from enforcing their rights or other

obligations with respect to claims they may have for similar mismanagement or misconduct.

## THERE HAS BEEN OTHER MISCONDUCT WHICH WARRANTS INVESTIGATION

38.     There is additional misconduct that Dyrkolbotn has been engaged in. Notably, with respect to an affilate of Iceberg's investment in an affiliated entity known as Viking Student Housing, Dyrkolbotn has engaged in substantial misconduct. Viking Student Housing was a company that held an interest in real estate that was controlled by Viking Companies.

39.     Dyrkolbotn and Viking Companies sold several of the properties held in the Viking Student Housing portfolio without notifying Iceberg's affiliate of the sale and then purchased an alternative parcel of real property known as The Vibe.

40.     They refused and otherwise failed to account for the profits from the sale, or to account for the proceeds of that sale, and on information and belief, Dyrkolbotn and Viking Companies misappropriated and otherwise converted those proceeds to be used for their own benefit. Iceberg's affiliate was never given an opportunity to consent to or otherwise assess the validity of the sale before it occurred, and Iceberg's affiliate would not have consented to such a sale.

41.     This conduct also resulted in the filing of lawsuits against Viking Companies and other related entities.

42.     In addition, there is a very significant amount of insider transactions that have not been investigated or pursued that need to be looked into, as there was likely a significant number of fraudulent transfer actions that exist between and amongst the different entities, where different entities controlled by Dyrkolbotn were paying for expenses that only benefitted other entities, such as marketing or other costs.

43.     Notably, Dyrkolbotn signed proofs of claim on behalf of Viking Construction Company in the amount of $987,700, Viking Companies, LLC in the amount of $973,135.56, Viking Property Management in the amount of $3,860.15, individually for an unknown amount of money, on behalf of SDPS Real Estate Investments, LLC for $433,542; on behalf of SHD Management, LLC for $15,000; SDPS Real Estate Investments IV, LLC for $142,000; CP City Place Partners LLC for $221,906.35, $857,200 on behalf of SHD Real Estate, LLC, $689,700 on behalf of SHD Vue Investments, LLC; $2,051,000 on behalf of Viking Construction, $8,857,338.48 on behalf of Viking Companies, and $34,000 on behalf of Viking Student Housing Partners, LLC, $30,000 on behalf of GNV RE Fund 3, LLC, and $221,906.35 on behalf of SDPS Real Estate Investments II, LLC. Accordingly, approximately $20 million of the $200 million in total debt is held by entities that are controlled by Dyrkolbotn.

44.     Not only do the Debtors propose to pay all of these claims in full, but they also are asking this Court to enter an injunction to prevent any party from interfering with Dyrkolbotn's right manage these claims.

45.     Moreover, the amount of the claims, and the lack of documentation to support them, coupled with SHD and the Debtors' refusal and concerted efforts to avoid providing discovery leads to the single inescapable conclusion that there was a substantial number of additional transactions involving insiders of the Debtor which provided Dyrkolbotn with an improper personal benefit, that need to be investigated.

46.     To date, however, there is no mechanism and no desire by or for the estate to investigate these matters.

## THE PLAN WAS PROPOSED IN BAD FAITH AND APPEARS TO VIOLATE THE OPERATING AGREEMENT OF THE SHOPS

In addition to the other issues presented by material parties, this Plan cannot be confirmed because it was clearly proposed in bad faith and does not comport with the applicable law in violation of 11 U.S.C. § 1129. Specifically, the Plan seeks to prevent Iceberg from exercising its rights under the Operating Agreement and seeks to avoid Iceberg's right to payments due to its preferred interest in the Shops.

SHD is seeking to have the Shops compensate it as the manager for services that are being rendered. However, to continue to act as the manager of the Shops, SHD is required to cure all of the defaults, and has not and did not make any provisions to cure those defaults prior to performing. That would otherwise include, without limitation, satisfying Iceberg's claims, by ensuring that distributions had properly been made to Iceberg and by recovering those amounts.

Under the bankruptcy code, a debtor is required to, "subject to the court's approval, [to] assume or reject any executory contract or unexpired lease of the debtor." An executory contract may not be assumed in part and rejected in part. *In re Yates Dev., Inc.,* 241 B.R. 247, 252 (Bankr.M.D.Fla.1999). A debtor seeking to assume an executory contract must accept its burdens as well as its benefits. *In re St. Johns Home Health Agency, Inc.,* 173 B.R. 238, 246 (Bankr.S.D.Fla.1994). A debtor cannot choose to accept the benefits or desirable features of the contract and reject the burdens or undesirable features of the contract to the detriment of the other party. *In re Yates Dev., Inc.,* 241 B.R. at 252 (citing *Richmond Leasing Co. v. Capital Bank,* 762 F.2d 1303, 1311 (5th Cir.1985); *In re Auto Dealer Services, Inc.,* 65 B.R. 681, 684 (Bankr.M.D.Fla.1986)); *In re Fifth Taste Concepts Las Olas, LLC*, 325 B.R. 42, 45 (Bankr. S.D. Fla. 2005). These defaults caused Iceberg to seek to exercise its rights under the Operating Agreement, such that the default could not be cured. However, the Plan cannot be confirmed,

performance cannot be made, and payments cannot legally be accepted by SHD for acting as manager without curing those defaults. The same would apply to the receipt of monies by CPH and CPH II during the life of the Plan, as those also appear to violate the terms of the Operating Agreement.

The fact that the payments under the Plan violate the terms of the Operating Agreement also means that the Plan cannot be confirmed under 11 U.S.C. § 1129, because it would otherwise operate to violate the law. Moreover, the Plan appears to improperly co-mingle the investments and monies from the 21 SPEs and to use distributions from them without regard to what is authorized such that the profitable companies, such as the Shops with only 50% of them being projected to be profitable, to help limit the shortfall that would be paid for other entities. This otherwise constitutes the improper comingling of funds and clearly violates the language and rights of other unknown and likely unidentified interested parties in twenty-one different non-debtor entities. Yet, all of the interested parties in the non-debtor entities appear to be prohibited from ensuring their rights are enforced under those governing agreements.

In that vein, Iceberg has requested and is entitled to vote for the removal of SHD as the manager of the Shops and to appoint its chosen designee to manage the Shops but has been prohibited by the filing of the instant bankruptcy from doing so. However, and even if a trustee is not appointed, Iceberg must still be permitted to and requests that the Court confirm that it is authorized to remove SHD as the manager of the Shops.

### THE PLAN IS NOT FEASIBLE

The Debtors have actively prevented Iceberg from understanding and obtaining documents that would demonstrate the mismanagement of the Shops and other affiliated entities, justifying the appointment of an examiner, if the Court finds that the appointment of a trustee is not

appropriate. *In re YC Atlanta Hotel, LLC*, 630 B.R. 348, 372 (Bankr. N.D. Ga. 2021); *Matter of Fiesta Homes of Georgia, Inc.*, 125 B.R. 321, 325 (Bankr. S.D. Ga. 1990) (finding that the plan was not confirmable where debtor's management would have been obligated to pursue preference actions against several close members of the debtor's officers' family.) The failures by the Debtor to investigate these claims while allowing affiliates and insiders of the Debtor to claim and seek nearly $20 million in claims against the Debtors. And, instead of allowing the fulsome investigation into those claims, the Plan seeks to prevent people from investigating them, and the Debtor has prevented Iceberg from assessing how it plans on making payments through the Plan. However, the plan appears to make it clear that the distributions from more than different special entities will be comingled to pay for the creditor body as a whole.

The comingling of assets amongst the different SPES also demonstrates that the Plan is not feasible and without further assurances of future payment or performance and therefore cannot be confirmed under 1129(a)(11). This section of the Code "is designed primarily to prevent confirmation of visionary schemes that promise a greater distribution than the debtor or plan proponent could ever attain." *In re Proud Mary Marina Corp.*, 338 B.R. 114, 123 (Bankr.M.D.Fla.2006)(citing *In re Bravo Enter. USA, LLC*, 331 B.R. 459, 474 (Bankr.M.D.Fla.2005)(internal quotations omitted)). "Basically, feasibility involves the question of the emergence of the reorganized debtor in a solvent condition and with reasonable prospects of financial stability and success." *In re Mulberry Phosphates, Inc.*, 149 B.R. 702, 708 (Bankr.M.D.Fla.1993)(quoting 5 Collier on Bankruptcy, P 1129.02[11] at 1129–54).

In determining if a plan is feasible, a court can consider such factors as the earning power of the business, its capital structure, and economic conditions. *In re Sovereign Oil Co.*, 128 B.R. 585, 586 (Bankr.M.D.Fla.1991)(citing *In re Clarkson*, 767 F.2d 417 (8th Cir.1985)). In addition,

past performance of the debtor can add clarity to a plan's feasibility. *See id.* at 587; *see also In re Malkus,* 2004 WL 3202212, at *4, 2004 Bankr.LEXIS 2120, at *10 (Bankr.M.D.Fla. November 12, 2004)("A debtor's past performance is one of the most important measures of whether a debtor's plan will succeed."). There is no question that the Plan as proposed is not feasible.

Despite that the Debtors themselves have operated at a loss of nearly a half a million dollars during the pendency of this proceeding, and there is nothing to indicate any cause of any increase in revenue, the Debtors claim that they will be able to generate nearly $100 million in revenue during a five-year period, through funding from Patricia Shively. *In re JRV Indus., Inc.*, 344 B.R. 679, 683 (Bankr. M.D. Fla. 2006). There has been a stipulation that Shiveley has the ability to fund plan payments, but there is nothing in the Plan that would ensure that within the ten-year duration of the Plan, Shively will have assets that are otherwise sufficient to satisfy the indebtedness as was contemplated by the Plan. There is also limited security to allow for or protect parties, such as Iceberg, which owns one of the few profitable enterprises that is associated with the Project, the Shops.

## THE INTEREST RATE DOES NOT COMPENSATE ICEBERG FOR THE VALUE OF ITS CLAIMS OR THE DURATION OF THE PLAN

Under applicable bankruptcy law, the interest rate is influenced by the rate of the proposed plan. The approach was first articulated in the case of *Till v. SCS Credit Corp*, 541 U.S. 465, (2004), which directed courts to *start* at prime, and then from there adjust the interest rate upwards based on the length of the plan and the risk inherent in connection with the Debtor. Here, the Debtors are seeking to pay Iceberg the value of its claims, which represents the amount Iceberg is owed as a result of the improper distributions received by CPH and CPH II, and to the extent that SHD has breached its fiduciary duties as it relates to Iceberg.

Here, the Debtor is proposing to pay prime over a ten-year period, which is the lowest interest rate for the maximum amount of time. It does not in any way shape or form compensate or otherwise consider the clear risks inherent in the plan, nor the length of time. As a result, the Plan does not properly provide for payment of Iceberg, amongst other creditors.

## **CONCLUSION**

The Debtors have now been involved in this bankruptcy process for nearly a year, and they have yet to file a plan that on its face can be confirmed. Although the Debtors' efforts through Patricia Shively, a co-guarantor, of the Debtor to fund shortfalls and compensate creditors is admirable. However, the Plan falls woefully short of the requirements for confirmation and is nothing more than haphazard effort to get the Court to rubber stamp and authorize through an injunction the comingling of assets from unrelated entities to try and pay creditors with no realistic expectation of doing so. And even if the Plan were to be confirmed, SHD should still be removed as the manager of the Shops.

WHEREFORE, Creditor, Iceberg Real Estate Investments, LLC, respectfully requests that the Court enter an Order Sustaining its Objection to Confirmation and Granting such further relief as the Court deems just and proper.

Respectfully submitted,

**MILLENNIAL LAW, INC.**
*Counsel for Creditors Iceberg Capital Partners, III, LLC*
*and Iceberg Real Estate Investments, LLC*
501 East Las Olas Blvd, Suite 200/314
Fort Lauderdale, Florida 33301
Phone: 954-271-2719

By:  *s/ Zachary P. Hyman*
      Zachary P. Hyman
      Florida Bar No.  98581
      zach@millenniallaw.com
      millenniallawforms@gmail.com
      jessica@millenniallaw.com
      assistant@millenniallaw.com

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on this **<u>5th</u>** day of February 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system and that a true and correct copy was served as set forth below:

By:  *s/ Zachary P. Hyman*
      Zachary P. Hyman
      Florida Bar No.  98581

**<u>Served via Notice of Electronic filing:</u>**

Conor McLaughlin, Esquire
conor.mclaughlin@usdoj.gov

Lauren Marie Reynolds, Esquire
lreynolds@whww.com
scolgan@whww.com
mbretana@whww.com
mbretana@ecf.courtdrive.com

Bradley M. Saxton, Esquire
bsaxton@whww.com
scolgan@whww.com
mbretana@whww.com
mbretana@ecf.courtdrive.com

Robert Scott Shuker, Esquire
rshuker@shukerdorris.com
mfranklin@shukerdorris.com
bkry@shukerdorris.com
atillman@shukerdorris.com
lstricker@shukerdorris.com

Lauren Stricker, Esquire
lstricker@shukerdorris.com
atillman@shukerdorris.com
bankruptcy@shukerdorris.com

Jesse Ellsworth Summers, Esquire
esummers@burr.com
sguest@burr.com

United States Trustee
USTPRegion21.TL.ECF@usdoj.gov

Noel R. Boeke
noel.boeke@hklaw.com
danielle.decker@hklaw.com
hapi@hklaw.com

John Blair Boyd
bk@svllaw.com
blairb@svllaw.com

Scott Wallace Cichon
Scott.Cichon@CobbCole.com
Bonnie.Rubino@CobbCole.com

John D. Elrod
elrodj@gtlaw.com
 fieldss@gtlaw.com

Matthew Blake Hale
mhale.ecf@srbp.com

Suzanne Hill
shill@rumberger.com
shillsecy@rumberger.com
docketingorlando@rumberger.com

Inez M. Markovich
imarkovich@mccarter.com

Paul Nicholas Mascia
pmascia@nardellalaw.com

Conor McLaughlin
conor.mclaughlin@usdoj.gov

Jose I. Moreno
jimoreno@bellsouth.net
 ruizcalderondr64903@notify.bestcase.com

Michael Anthony Nardella
mnardella@nardellalaw.com
klynch@nardellalaw.com
msayne@nardellalaw.com
kosment@nardellalaw.com

Michael J. Niles
mniles@bergersingerman.com
efile@bergersingerman.com
zmorton@bergersingerman.com
efile@ecf.courtdrive.com

Edward J. Peterson
edwardp@jpfirm.com
andrenaw@jpfirm.com
Jillc@jpfirm.com
melanief@jpfirm.com

AngelinaL@jpfirm.com

Charles A. Postler
cpostler.ecf@srbp.com

Michael Stephen Provenzale
michael.provenzale@lowndes-law.com
anne.fisher@lowndeslaw.com
litcontrol@lowndeslaw.com

Nicholas V. Pulignano
nvp@marksgray.com

**Served via U.S. Mail:**

Celebration Pointe Holdings, LLC
5001 Celebration Pointe Ave.
Suite 180
Gainesville, FL 32608

Celebration Pointe Holdings II, LLC
5001 Celebration Pointe Ave.
Suite 180
Gainesville, FL 32608

SHD-Celebration Pointe, LLC
5001 Celebration Pointe Ave.
Suite 180
Gainesville, FL 32608

Debtor's Counsel:
Robert Scott Shuker
Lauren Stricker
Shuker & Dorris, PA
121 S. Orange Avenue, Suite 1120
Orlando, FL 32801